SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

SOLUCORP INDUSTRIES LTD., Joseph S. Kemprowski, Peter R. Mantia, James G. Spartz, Robert Kuhn, Victor Herman, Arle Pierro, W. Bryan Fair and Glenn R. Ohlhauser, Defendants.

No. 99 CIV. 11965(WCC).

United States District Court,
S.D. New York.

July 25, 2003.

Securities and Exchange Commission, Attorneys for Plaintiff, Washington, D.C., Joaquin M. Sena, Esq., Nina B. Finston, Esq., Michael K. Lowman, Esq., Of Counsel.

Krebsbach & Snyder, P.C., Attorneys for Defendants, Joseph S. Kemprowski, Peter R., Mantia, Robert Kuhn, Victor Herman, New York, NY, Theodore R. Snyder, Esq., Of Counsel.

**OPINION AND ORDER**

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Securities and Exchange Commission (the "SEC") brings this action against defendants Joseph S. Kemprowski, Peter R. Mantia, Victor Herman and Robert Kuhn, alleging that defendants, in violation of federal securities laws and SEC rules and regulations were (1) involved in the dissemination of false statements in press releases and SEC filings, (2) engaged in accounting fraud and (3) improperly trading in the securities of Solucorp Industries Ltd. ("Solucorp" or the "Company"). On March 17 through March 25, 2003, this Court conducted a bench trial. For the reasons that follow, we enter judgment in favor of plaintiff. Pursuant to FED. R. CIV. P. 52(a), we set forth below our findings of fact and conclusions of law.

**FINDINGS OF FACT**

**I.   Solucorp Industries Ltd.**

Solucorp [1] is a Yukon Territory corporation. During the period July 1995 through mid-September 1996, the Company was headquartered in Saddlebrook, New Jersey. The Company relocated its headquarters to West Nyack, New York on or about September 15, 1996. (Statement of Agreed Facts ("SAF") ¶¶ 2–3.) Its principal business is environmental remediation, including developing and licensing of products for use in environmental clean-ups. (*Id.* ¶ 2.) Solucorp owns a United States patent for its Molecular Bonding System ("MBS"), a chemical process of remediat-

---

1. On March 13, 2003, this Court entered a Final Judgment against Solucorp permanently enjoining the company from future violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78(b)(2)(B) ] and Rules 10b–5, 13a–1, 13a–10 and 13a–13 [17 C.F.R. §§ 240.10b–5, 240.13a–1, 240.13a–10 and 240.13a–13] thereunder. Solucorp consented to entry of the judgment without admitting or denying the allegations of the Complaint.

ing soils by removing heavy metals such as lead, mercury, chromium and arsenic. Solucorp's securities traded on the Vancouver Stock Exchange ("VSE") until December 1995, when the VSE suspended trading. Solucorp delisted its securities from the VSE on August 6, 1996, after an eight-month trading suspension. Solucorp's securities began trading on the National Association of Securities Dealers ("NASD") Over–the–Counter Bulletin Board ("OTCBB") on August 6, 1996. Solucorp registered its securities with the SEC under Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78*l* (g) ], effective February 20, 1998. The SEC suspended trading in Solucorp's securities on May 1, 1998 pursuant to Section 12(k) of the Exchange Act [15 U.S.C. § 78*l* (k)].[2] (SAF ¶ 2.)

In the last few years since Solucorp came under investigation by the SEC, the Company lost service contracts and could not borrow money. Most employees left the Company because they were not getting paid and Solucorp has been reduced to four employees. (Trial Tr. at 122, 936, 937, 985, 992.) Solucorp's revenues have been inadequate to cover its expenses and the Company used its stock during this period to finance operations. (Pinsky 11/7/02 Dep. at 24–26, 150–51, 153, 159–61; Zheng 7/20/01 Dep. at 121; Pl. Trial Exs. 79 at SOL5548–52, 300 at 25, 403B at 256– 57; Trial Tr. at 33–35, 40–41, 179–80; Janis Dep. at 51, 57–58, 60.)

According to defendants, the Company has prospects of getting substantial revenue through a licensee that is active, doing work at the Boston artery and another highway and working on projects in Italy and Providence, Rhode Island. (Trial Tr. at 993, 995, 1053.) In addition, the Company is working to develop its Integrated Fixation System product line, which includes products pertaining to the decontamination of lead paint and batteries. (*Id.* at 1051.)

## II. *Joseph S. Kemprowski*

Kemprowski, age 55, worked early in his career in compliance at the New York Stock Exchange ("NYSE"), and worked his way up to a supervisor of four others who together conducted reviews of a quarter of the NYSE member firms. (*Id.* at 931.) From October 1988 to March 1990, Kemprowski served as a president of Cambridge Consulting ("Cambridge"), a consulting firm with two other employees that he founded. (*Id.* at 846, 848.) Cambridge functioned as a public relations firm, which issued press releases for small businesses, including public companies. (*Id.* at 847, 848.) As Kemprowski described it: "Well, we basically turned into a [public relations] firm. . . . The idea was to talk up the Company to people interested in getting involved by buying stock in the Company." (*Id.* at 848.) Cambridge marketed the stock of its clients, including World Tec, which later changed its name to Solucorp. (*Id.* at 848, 850–51.) According to Kemprowski, World Tec changed its name to Solucorp because World Tec had been getting "bad press" and had developed a reputation due to numerous trading halts that it had experienced. (*Id.* at 851.) Cambridge changed its name to EPS Environmental, Inc. ("EPSE"), when it ceased its public relations business due to problems with the SEC. Kemprowski served as its president and chief executive officer ("CEO"). Subsequently, EPSE became

**2.** Section 12(k) states in relevant part, "[I]f in its opinion the public interest and the protection of investors so require, the Commission is authorized by order . . . summarily to suspend trading in any security (other than an exempted security) for a period not exceeding 10 business days. . . ." [15 U.S.C. § 78k].

the chief operating subsidiary of World Tec, and later Solucorp. (*Id.* at 850–52.)

In November 1994, following its discovery of Kemprowski's 1983 guilty plea[3], the VSE requested that Kemprowski resign as officer and director of Solucorp. (*Id.* at 854–56; Kemprowski Answer to ¶ 13 of the Complt. (¶ 14 of the 2d Am. Complt.).) In response, Kemprowski resigned as an officer and director of Solucorp, but retained his position as president, CEO and chairman of EPSE. (Trial Tr. at 855–56.)

In December 1994, the SEC sanctioned Kemprowski and Cambridge for distributing materially false and misleading information concerning the assets and future revenues of a client, Astro Enterprises, and for acting as an unregistered broker. The conduct at issue occurred in 1988 and 1989. The SEC ordered Kemprowski to cease and desist from committing or causing future violations of the anti-fraud provisions [Section 17(a) of the Securities Act [15 U.S.C. § 77q(a) ] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b) ] and Rule 10b–5 [17 C.F.R. § 240.10b–5] promulgated thereunder] and broker-dealer provisions of the federal securities laws; barred him from association with any broker, dealer, municipal securities dealer, investment adviser or investment company with a right to reapply after five years; and ordered him to disgorge his ill-gotten gains of $135,000, payment of which was waived by the SEC based on the sworn financial representations of Kemprowski. The matter was settled without Kemprowski admitting or denying the SEC's charges. *In the Matter of Joseph Kemprowski and the Cambridge Consulting Co.,* Admin. Proc. File No. 3–8569, Ex. Act Rel. No. 35058, 1994 WL 684628 (December 9, 1994). (Pl. Trial Ex. 202; Trial Tr. at 860–62.)

In December 1995, the VSE notified Solucorp and Kemprowski that it was requiring Solucorp to sever all relations with Kemprowski. The VSE's action followed its discovery of the 1994 administrative proceeding instituted by the SEC against Kemprowski. (Pl. Trial Exs. 427, 428, 429.) Kemprowski formally resigned as an officer and director in May 1996. (Pl. Trial Exs. 214, 215, 216, 217; Trial Tr. at 853–54, 856.) According to Kemprowski, since that time he has operated under a consultant agreement with Solucorp. He claims to have acted only in the capacity of a consultant to Solucorp, his only client, advising Mantia on contract issues that arose. (Trial Tr. at 326, 863.) Kemprowski maintains that he had no authority to sign contracts that bound Solucorp or to sign or issue press releases or to make financial disclosures for the Company, that he reported to Mantia, and had no authority to instruct Mantia to do anything. Kemprowski admits to having a forceful personality and an influence, but claims to exercise no control over the Company or its management and to have no involvement with Solucorp's accounting decisions. (*Id.* at 930, 941–42.) He describes himself as someone who is a "key member of Solucorp's personnel" who "may conceive [of projects] on his own with the concurrence of senior management" and "often acts as the leader of the Solucorp effort" with respect to projects. (Pl. Trial Ex. 89 at 9.)

---

3. In a 1983 New Jersey State criminal proceeding, Kemprowski plead guilty to theft by defrauding customers of a business he owned at the time. In connection with his guilty plea, Kemprowski was placed on probation and ordered to pay restitution of $153,000. He was later charged with violating his probation for failure to pay the restitution. (Trial Tr. at 854–58; Pl. Trial Ex. 200 at 1, 4, Pl. Trial Exs. 201, 222; *State v. Kemprowski,* 265 N.J.Super. 471, 627 A.2d 1151 (1993).)

Plaintiff claims that Kemprowski was acting as a consultant in name only and that Kemprowski was in fact a *de facto* officer of Solucorp. In support of this contention, plaintiff directs our attention to the following facts:

Kemprowski continued to occupy the largest office in the Saddlebrook, New Jersey corporate headquarters even after his November 1994 resignation as an officer of Solucorp. (Trial Tr. at 928; Pl. Trial Ex. 400 at 98.) Since the Company relocated to West Nyack, New York in September 1996 Kemprowski has occupied one of Solucorp's corner offices, with defendants Mantia, Herman and Kuhn occupying the other corner offices. Kemprowski's office was the largest of the four corner offices, and the only one of the four to have a private bathroom and an adjoining office for his own secretary, one of only two at the Company. (Pl. Trial Exs. 99, 99A; Trial Tr. at 15, 260–62, 928; E. Kemprowski Dep. at 47–48.) Solucorp paid for Kemprowski's office and secretary. (Trial Tr. at 970.) At trial, when explaining why he had the largest office, Kemprowski described himself as the "founder" of Solucorp, and testified that because he was the one who was responsible for raising money for the Company, "how could they not turn around and say, 'Okay. Take this office?'" (*Id.* at 929–30.)

Kemprowski's office had monitors on which he observed trading in securities (*id.* at 15, 16), including, according to Herman, transactions in Solucorp securities. (*Id.* at 881; Pl. Trial Ex. 402 at 216–17.) In April and July 1998 Kemprowski told Lawrence Kreisler, a potential business partner, that his motivation in "making a market" in Solucorp securities, was to maintain the per share price at $10 so as to induce a third party to acquire Solucorp. Kemprowski claimed to effect trading through Vancouver, in apparent reference to brokerage accounts maintained with Vancouver brokerages. (Trial Tr. at 33–35, 47–48, 881–82.)

Kemprowski had been one of Solucorp's highest paid personnel. (Pl. Trial Exs. 218, 229, 237, 517B at 222, 225–27, 239; Trial Tr. at 638–40.) He was granted approximately 720,000 stock options during the period June 1997 through February 1998—more than any other Solucorp officer or director, other than his wife, Arle Pierro,[4] who was a director of the Company at the time. (Pl. Trial Exs. 79 at SOL5530–34, SOL5565, SOL5598, 403 at 70–71.) At trial, Mantia testified that Kemprowski and his wife, Pierro, could get any amount of options they desired or required. (Trial Tr. at 1092–93.) Kemprowski, with his wife, also continued to borrow from the Company, owing Solucorp $72,664 as of June 30, 1996 (Pl. Trial Ex. 159 at 299); $110,127 as of June 30, 1997 (Pl. Trial Ex. 159 at 300); $474,318 as of December 31, 1997 (Pl. Trial Ex. 161); and $257,939 as of December 31, 1998. (Pl. Trial Exs. 234, 402 at 71–72.)

Kemprowski maintains that he invested the proceeds from the exercise of his options in the Company. On being asked why the Company does not simply sell shares directly from the treasury to the public to raise funds, he claimed that the exercise of options was intended to benefit the Company as well as reward the individual. (Pl. Trial Ex. 401A at 189.) Until

4. On March 13, 2003, this Court entered a Final Judgment against Pierro permanently enjoining her from violating Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rules 16a–2 and 16a–3 [17 C.F.R. §§ 240.16a–2 and 240.16a–3] thereunder and ordering her to pay a civil penalty in the amount of $10,000 under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]. Pierro consented to the entry of the judgment without admitting or denying the allegations of the Complaint.

August 1997, Kemprowski continued to use a corporate credit card provided to him by Solucorp. In August 1997, the cards for all Solucorp officers were cancelled due to delinquent payment. (Trial Tr. at 262, 270; Pl. Trial Ex. 248.) In addition, Solucorp continued to pay the automobile insurance on Kemprowski's Mercedes Benz up through at least 1998. (Trial Tr. at 266, 270; Pl. Trial Exs. 229 at 2, 403A at 219.)

One trial witness, David Porteous, described Kemprowski as a "forceful consultant" and described Solucorp as "Joe's baby." (Trial Tr. at 111.) When asked to explain why he had described Kemprowski as a "forceful consultant," Porteous, in part, said, "He's a man of strong opinions and a big voice and commanding presence, and if he thought I was doing something stupid, he wasn't diplomatic in saying so. If he thought Pete was letting the ball drop on something, he would certainly— you could hear him several rooms away." (*Id.* at 111–12.)

At trial Kemprowski acknowledged that he was a "forceful consultant" and explained: "I am a forceful personality. And I'm even more forceful if I think there's a bunch of people that I've got to figure out how to pay who aren't bringing in money to the Company. So I could yell, I could rant if I wanted to, because what were you going to do? Throw me out? I mean, you couldn't throw me out. I was the only guy bringing money in, they weren't." (*Id.* at 941–42.)

In December 1997, Kemprowski introduced himself to Kreisler as Solucorp's CEO and chief operating officer. (*Id.* at 5, 9–11.) Based on observations over a nine-month period, which included several meetings and negotiations with Kemprow-

ski and other Solucorp personnel, Kreisler concluded that "Kemprowski was Solucorp . . . [and] that nobody did anything either in the field or in the office that he did not direct or approve." (*Id.* at 52.) Kreisler observed that even Solucorp's president, Peter Mantia, would first have to check with Kemprowski before responding to questions. (*Id.* at 35–36, 52.) Similarly, Glenn Ohlhauser,[5] the engagement partner with Solucorp's outside auditor, testified that Mantia and Herman told him on occasion that they had to review matters with Kemprowski before they could be completed. It also was Ohlhauser's observation that Kemprowski was involved in the Company's management during 1997 and 1998. (*Id.* at 170–71.)

Other third parties have addressed Kemprowski as the CEO and/or chairman of the Company. For example, Martin E. Janis, the head of a public relations firm that was retained in January 1997 by Solucorp (Janis Dep. at 7–8), consistently addressed Kemprowski as the Company's CEO. The first letter agreement relating to the firm's retention was addressed to and signed by Kemprowski as the CEO. (Pl. Trial Ex. 404; Janis Dep. at 20–22.) Although Mantia added his signature (Pl. Trial Ex. 404 at 3), Janis continued to address Kemprowski as the CEO in correspondence. (Pl. Trial Exs. 220, 221.) For example, in June 1997, following a meeting with Kemprowski, Mantia and Spartz, Janis addressed a memorandum to Kemprowski as CEO. The memo summarized Janis' understanding of the parties' discussions and thanked him for arranging the meeting. (Pl. Trial Ex. 221; Janis Dep. at 55–57.) Other Solucorp business partners also have addressed Kemprowski as CEO.

**5.** On January 16, 2003, this Court entered a Final Judgment against Ohlhauser permanently enjoining him from future violation of Section 10A of the Exchange Act [15 U.S.C. § 78j–1].

For example, one party seeking to do remediation work jointly with Solucorp in Poland wrote to Kemprowski in January 1996, addressing him as chairman. (Pl. Trial Ex. 52.) Also the managing director of a firm licensed by Solucorp to use the MBS process in the United Kingdom regarded Kemprowski to be a "director" of Solucorp, as he did Mantia. (Beech Dep. at 6, 71–73.)

Plaintiff further maintains that Kemprowski made efforts at times to hide his role as a *de facto* officer of Solucorp with the complicity of Mantia, among others. For example, Solucorp's outside counsel, Bernard Pinsky, had no inkling of Kemprowski's continued involvement in the Company, or of the benefits he continued to receive. According to plaintiff, Pinsky should have been informed of this given that he represented the Company before the VSE concerning the VSE's demand that Kemprowski sever all ties with Solucorp. (Pinsky 11/7/02 Dep. at 77–80, 93–99, 114–15; Pl. Trial Ex. 43.) Instead, when he advised Mantia and Spartz that the VSE would "insist on knowing that Joe is really gone," they misled him into believing that Kemprowski no longer maintained an office at Solucorp's headquarters. (Pinsky 11/7/02 Dep. at 152–56; Pinsky 11/8/02 Dep. at 203, 211–12.) Pinsky confirmed his misunderstanding in a May 1996 memo to Mantia and Spartz in which he declared, "Joe is now out of the Company." (Pinsky 11/7/02 Dep. at 154–55.) However, they apparently failed to correct him.

Pinsky subsequently represented Kemprowski, at the Company's behest, in response to inquiries by the British Columbia Securities Commission ("BCSC") in March 1998 about Kemprowski's continued role at Solucorp and EPSE. (Pinsky 11/8/02 Dep. at 206–11.) The BCSC had come into possession of one of Kemprowski's business cards that identified him as the CEO and chairman of EPSE. (Pinsky 11/8/02 Dep. at 210–11, 213–17; Pl. Trial Ex. 228.) Kemprowski told Pinsky that the business card was an old one, and that he no longer handed out business cards with that designation. (Pinsky 11/8/02 Dep. at 217.) Kemprowski further informed Pinsky that he was not acting as an employee of Solucorp, that there were no employee deductions taken for him, and that he did not receive benefits or insurance from the Company. (*Id.* at 217–18.) Pinsky conveyed Kemprowski's explanation of the business card to the BCSC in a letter dated March 26, 1998. (*Id.* at 219–21; Pl. Trial Ex. 440.)

Plaintiff suggests that, contrary to Kemprowski's representations, there are indications that Kemprowski was passing out the business card long after he had purportedly resigned as an officer from EPSE. For example, the card gives EPSE's address as 250 West Nyack Road, West Nyack, New York, and bears a New York telephone number. (Pl. Trial Ex. 228.) Solucorp and EPSE did not move to this address until mid-September 1996— approximately four months *after* Kemprowski's purported resignation from EPSE. (SAF ¶ 3; Pl. Trial Ex. 217.) During his testimony in November 2002, Pinsky denied knowing that Solucorp continued to provide Kemprowski with various perquisites. (Pinsky 11/8/02 Dep. at 212–13.) Pinsky testified that Solucorp's provision of these benefits to Kemprowski was not consistent with his understanding that Kemprowski was a "consultant." (*Id.* at 212–13.)

In March 1998, Kemprowski was responding to the BCSC's inquiries about his continued role with Solucorp and EPSE. Around that time, KBF presented Kemprowski with a contract for his signature. (Trial Tr. 26–27.) The signature line iden-

tified Kemprowski as CEO of Solucorp. Kemprowski refused to sign the contract, directing that Mantia's name and title be substituted for his. Kemprowski did not deny that he was Solucorp's CEO, but maintained that it was Solucorp's policy to have the president sign any contract. Accordingly, the signature page was changed and Mantia signed the contract instead of Kemprowski. Immediately thereafter, Kemprowski "backed out" of a group photograph taken to memorialize the signing of the contract. (*Id.* at 26–29.) Later, on July 14, 1998, Kemprowski explained to KBF's board that he was not formally the chairman of the board or CEO of Solucorp but was merely "making a market" in Solucorp stock. (*Id.* at 44, 46.)

## III. *Peter R. Mantia*

Mantia, age 55, has been the president and a director of Solucorp since February 1995. (SAF ¶ 5.) Between 1965 and 1979, Mantia worked his way up from a mail clerk to a senior buyer at Sears, Roebuck & Co. ("Sears"). (Trial Tr. at 983–84.) In 1979, when Sears moved its offices from New York to Chicago, Mantia left the Company and joined BMW North America ("BMW") as a senior buyer responsible for purchasing of goods and services; he worked for BMW until 1994. (*Id.* at 984–85.) In December 1994, Mantia joined Solucorp as its chief operating officer. (*Id.* at 984–85.) Upon being hired, Mantia received options to purchase 225,000 shares of Solucorp stock. However, he was only allowed to use 25,000 of them. The rest were taken over by Solucorp's principals who split it up among themselves. (*Id.* at 1085–86, 1090–91, 1094.) In February 1995, Mantia became a director and was promoted to president of the Company. (SAF ¶ 5.)

Prior to the commencement of this case, Mantia had not been accused of or found to have violated the securities laws. (Trial Tr. at 986.) Before joining Solucorp, Mantia had no experience in running a public company, no experience in the issuance of press releases and no experience with respect to the financial disclosures of a public company. (*Id.* at 986.) Additionally, prior to joining Solucorp, he had no experience working in the environmental remediation industry. (*Id.* at 987.) When Mantia joined the Company in 1994, the MBS technology was proven in the lab, but not field-proven. (*Id.* at 985.) Mantia's job was to take the lab-proven technology and get it to the field. (*Id.*) In early 1995, Solucorp was still a research and development Company; it did not have any equipment or contracts and was trying to become an operating entity, although no one was interested in being the first to use the technology. (*Id.* at 988, 1043–44.) The Company's first project was in June 1995, and based on his confidence in and need to prove the technology, Mantia offered to do the project for free if the soil was not cleaned. (*Id.* at 1002–03.) That project was successfully completed. (*Id.* at 1003.)

In the context of this underfunded startup company, Mantia was busy trying to demonstrate the technology, including finding sources of supply for chemicals and working with the engineers. (*Id.* at 997.) He spent only 5 to 10 percent of his time on administrative matters. (*Id.* at 998.) Mantia learned soon after joining the Company of its prior regulatory problems with the VSE. He consulted with the Board of Directors, and they agreed that the Company would search for a new law firm to assist it in regulatory matters. (*Id.* at 999.)

Mantia did not draft any of the press releases issued by Solucorp. (*Id.* at 1047.) According to Mantia, there was not a core group at Solucorp that wrote or reviewed press releases. (*Id.* at 686.) In 1997, in

an effort to improve the Company's system for the review of press releases, Mantia adopted a procedure that required physical sign-offs by people at the Company who were involved in drafting the press release and providing information. (*Id.* at 1049.) He wanted to see a document (e.g. a buck slip) bearing the initials of the people involved indicating that they had reviewed the press release. (*Id.*)

## IV. *Victor Herman*

Herman, age 61, is a certified public accountant ("CPA"). During the relevant period, he was the chief financial officer of Solucorp's chief operating subsidiaries from September 1995 until his resignation in early 1999. Beginning with the quarter ending December 31, 1995, Herman was responsible for preparing the financial statements of the holding company, Solucorp, and signed quarterly filings with the SEC in 1998 as Solucorp's chief financial officer and principal accounting officer. (SAF ¶ 6; Trial Tr. at 433–35; Pl. Trial Exs. 302 at 118, 303 at 196; 402 at 12, 57–58.) At the time he became the chief financial officer of Solucorp's chief operating subsidiaries, including EPSE, in September 1995, Herman had approximately thirty years of experience in accounting. During the 1960s he had worked on the audit staff of Arthur Young. Since then, with a number of companies, he has held financial executive positions, including internal Audit Manager and Senior Vice President of finance, before joining EPSE. (Trial Tr. at 434–35, 479.) Herman is retired and currently lives in Florida. He is currently unemployed and does no consulting work. He has no intention of working again. (*Id.* at 479–80.)

## V. *Robert Kuhn*

Kuhn, age 48, was the senior vice president of Sales and Marketing at Solucorp from August 1994 until his resignation in the fall of 1999. (SAF ¶ 7; Trial Tr. at 404–05; Pl. Trial Ex. 400A.) Kuhn's prior background involved advertising and sales at large companies. (Pl. Trial Ex. 400 at 11–12, 18.) Based on Kuhn's large company experience, he realized that Solucorp lacked a reliable means of tracking business information. (Pl. Trial Ex. 400 at 17–19, 23–24, 26–28, 31.) As a result, Kuhn instituted surveys that tracked the status of all potential work as well as reports tracking monthly sales and profit forecasts. (*Id.*) Kuhn kept apprised of all active and potential contracts and was the most knowledgeable person at the Company as to such matters. (*Id.* at 19, 193–95). According to Kuhn, the public disclosure of information concerning the Company's activities was not part of his job function. Kuhn's involvement in press releases consisted of turning over to management contracts or proposals which formed the basis of press releases drafted by others. (Trial Tr. at 337, 341, 390.)

Kuhn resigned his position at the Company in or about July 1999. (SAF ¶ 7.) At the time of trial he was employed as a Marketing Sales Manager for Nielsen Bainbridge in New Jersey, a privately held wholesale company in the picture frame industry.[6] (Trial Tr. at 373–74.) Kuhn has not been involved in any aspect of his current employer's financial reporting, accounting or press releases. (*Id.* at 374.) In 24 years of employment, Kuhn has no prior history of securities fraud or regulatory violations or complaints. (*Id.* at 372.)

---

**6.** Subsequent to trial, Kuhn was notified that his position was being eliminated as of July 31, 2003. He has no other job offers at the present time and expects, in light of market conditions, that it may take 6–9 months to find substitute employment.

## VI. *Solucorp's Press Releases and Publications*

Personnel at the Company's headquarters in New Jersey and, after September 1996, New York offices controlled the dissemination of press releases and filings with regulatory entities. (Pl. Trial Exs. 400 at 15, 143–45, 154–55, 194, 401A at 10–77, 402 at 12, 57–58, 403A at 20–23, 101–02; Pl. Trial Exs. 510, 517B at 30–56; Trial Tr. at 463; Pinsky 10/13/98 Tr. at 27, 29, 31, 107.) It was Solucorp's policy to publish press releases to announce significant events. (Trial Tr. at 339, 561; Pl. Trial Ex. 517A at 27–29.)

### A. *IEM/Sealand, Inc. Contract*

In a July 6, 1995 press release, Solucorp announced that it had received a "purchase order from IEM/Sealand, Inc. to remediate a minimum of 15,000 tons of heavy-metal-contaminated soils in Waterbury, Connecticut" utilizing MBS. The release further stated that the "purchase order contracts for the remediation of 15,000 tons of soil ... and including disposal will result in revenues of $74,000 per day for a minimum 25–day remediation period resulting in total revenues of $1.85 million [Cdn.] ...." (SAF ¶ 8(a); Pl. Trial Ex. 1.) The Company had relied on the estimate of the general contractor for the amount of contamination in the ground, and also sent two people out to the site for an examination of the contamination in the ground. (Trial Tr. at 1004.) The field engineers confirmed the amount of soil claimed by the general contractor. (*Id.* at 1005.)

In fact, under the terms of its written contract with IEM/Sealand, dated July 3, 1995, Solucorp could anticipate at most $684,000 (U.S.) for remediating 15,200 tons of soil. Moreover, the contract expressly stated that the quantity of soil ultimately remediated was not guaranteed. (Pl. Trial Ex. 2 at SOL1430.) The contract further

expressly provided that "IEM SEALAND Corporation [was] to provide transportation and disposal of treated soils." (*Id.*; Pl. Trial Ex. 3.) Solucorp had an oral assurance that IEM/Sealand anticipated putting the transportation and disposal work ("T & D") out to bid at a later date and, if Solucorp's bid was competitive, Solucorp would be awarded the contract. (Pl. Trial Ex. 400 at 44–50, 54–55, 62, 157.) Kuhn, who negotiated the IEM/Sealand contract (Trial Tr. at 329), testified that he told Mantia, based on verbal assurances from Brian Mackenzie of IEM/Sealand, that Solucorp would be doing the T & D, but that the award of the contract was contingent on Solucorp's price being competitive, indicating that the contract had not yet been awarded. (Pl. Trial Ex. 400 at 157.)

Al Ludwig, another Solucorp employee involved with the operations at IEM/Sealand, also testified that, from his discussions with Kuhn, he understood that Solucorp was definitely going to do the T & D work at the site. (Ludwig Tr. at 106.) Although Kuhn submitted proposals to IEM/Sealand for the T & D work in July and August 1995 (Pl. Trial Exs. 4, 5, 6)—after the issuance of the July 6, 1995 press release—Solucorp never did obtain a contract to do T & D work at the Waterbury, Connecticut site. (Pl. Trial Exs. 7, 8 at SOL1447, 9, 13, 400 at 62–70; Trial Tr. at 415–20.)

Solucorp completed its remediation of soil at the Waterbury, Connecticut site on October 5, 1995. Total tonnage remediated was 3,854. (SAF ¶ 8(b).) Kuhn and the rest of Solucorp management knew by October 5, 1995 the total tonnage treated on the project. (Pl. Trial Exs. 400 at 78, 517A at 259–61.) Solucorp announced in an October 5, 1995 press release that it had "successfully completed" its remediation project for IEM/Sealand in Connecticut. (SAF ¶ 8(c); Pl. Trial Exs. 10, 11, 12;

Pinsky 10/13/98 Tr. at 66–70.) The October 5, 1995 press release did not disclose, however, that Solucorp had remediated only 3,854 of the initially announced 15,000 ton minimum and would not receive the $1.85 million (Cdn.) previously announced nor the $1.2 million (Cdn.) for T & D services. (Pl. Trial Exs. 400 at 58, 78, 517A at 259–61, 517B at 50.)

Mantia reviewed the press release before it was disseminated, relying upon information provided by individuals directly involved with the IEM/Sealand operations. (Trial Tr. at 1004–05.)

### B. NHD, Inc. Contract

Solucorp announced in an October 11, 1995 press release that it had "signed a contract with LCM Corporation ... to remediate ... 4,000 tons of copper bottom ash ... which will result in revenues of $626,400 (Cdn.) [approximately $460,000 U.S.] to the Company." (SAF ¶ 9(a); Pl. Trial Ex. 14.) In fact, $626,400 (Cdn.) was the maximum amount payable to the general contractor, NHD, Inc., not to Solucorp. (Pl. Trial Exs. 400 at 146–50, 517B at 60–64, 70.) Further, the general contract provided for a range of 1,300 to 4,000 tons of soil to be remediated, and the general contractor told Kuhn that it expected only 3,000 tons actually to be remediated. (Pl. Trial Ex. 400 at 145.) Under the terms of its subcontract, Solucorp stood to earn only $71,500 (U.S.) to $220,000 (U.S.), depending on total tonnage remediated. (Not denied in Kemprowski, Mantia, Herman and Kuhn Answers to ¶ 22(b) of the Complt.) (¶ 24(b) of the 2d Am. Complt.; Pl. Trial Exs. 14, 16, 17, 400 at 145–48, 150–53, 258.) Solucorp ultimately remediated only 1,500 tons and earned $111,000 (Cdn.) (approximately $82,000 (U.S.)) in revenue. (Pl. Trial Ex. 9 at 6.) Kuhn negotiated Solucorp's subcon-

tract. (SAF ¶ 9(c); Trial Tr. at 329; Pl. Trial Ex. 5, 15, 17, 400 at 150–51.)

However, he did not draft, edit or disseminate the October 11, 1995 press release. (Trial Tr. at 389.) He was not the person from Solucorp responsible for issuing press releases, and he was not involved in the calculation of revenue estimates set forth in the press release. (*Id.* at 390.) He first learned of the error when he was subpoenaed by the SEC. (Trial Tr. at 390.) James Spartz of Solucorp reviewed for accuracy, signed and ordered the dissemination of the October 11, 1995 press release. (SAF ¶ 9(d).)

### C. Puerto Rico Contract

In 1995, Solucorp opened an office in Puerto Rico to develop new business and to undertake an environmental training program in conjunction with its Environmental Training Institute ("ETI"), which Solucorp had purchased from its employee, Ludwig. (Ludwig Tr. at 9, 11–12, 63, 65–66.) Felix Gonzales, a well-regarded ETI instructor, was chosen to operate the Company's Puerto Rico office. (*Id.* at 11, 74–75.) Solucorp announced in an October 31, 1995 press release that it had received "its first contract from its office in San Juan, Puerto Rico for $850,000 for Occupational Safety and Health Training of 2000 students in Puerto Rico with The School of Engineers, Department of Continuing Education, San Juan, Puerto Rico." (SAF ¶ 10(a).) It was the responsibility of Ludwig, a Solucorp vice president, to supervise the Puerto Rico operations. (Trial Tr. at 582.) Gonzales reported to Ludwig. (*Id.*) However, Ludwig was "stretched" and not able to properly perform his supervisory responsibilities. (Ludwig Tr. at 93–95.)

In or about late October 1995, Mantia received, by fax, a copy of the contract executed by Gonzales on behalf of ETI and by Felix Lopez of The School of Engi-

neers. (Trial Tr. at 539.) Solucorp later received a small payment in connection with that contract. *See* Defs. Trial Ex. R (check for $4,150). Plaintiff argues that there was never a Puerto Rico contract because Solucorp has been unable to locate a signed agreement despite an extensive search in which, according to Mantia, the "whole Company was looking for the contract" in response to an SEC investigative subpoena issued in 1998. (Trial Tr. at 544–45, 547.)

In or about late June 1996, Gonzales disappeared and stole all of the equipment and records from Solucorp's office in Puerto Rico. (*Id.* at 483, 546.) Solucorp filed a police report and retained counsel in Puerto Rico but was unsuccessful in recovering any of its property or in locating Gonzales. (*Id.* at 546, 583, 585.) Solucorp was unable to locate the original or any copy of the executed contract, which was acknowledged in the Company's 8–K filing in March 1999. (Trial Tr. at 574–75; Defs. Trial Ex. B at 6.) Mantia did not draft the October 31, 1995 press release concerning the Puerto Rico contract. (Trial Tr. at 1047.) However, Mantia reviewed and signed the press release based upon his review of the contract that had been received from Gonzales. (*Id.* at 539.)

### D. *IDM Environmental Corp. Contract*

#### 1. *Background*

In June 1995, the University of California (the "University"), as administrator of cleanup operations at Los Alamos National Laboratory ("LANL"), awarded Basic Ordering Agreements ("BOA") to four companies, including IDM Environmental Corp. ("IDMC") (Pl. Trial Exs. 33, 34, 35, 400 at 104, 137; Capote Dep. at 21–22, 39–40; John Tuohy Dep. at 25–27.) Under a BOA, each BOA recipient became part of a pre-selected pool of contractors who were permitted to submit bids to perform work as may be needed by LANL. No work was assigned, or monetary amount fixed, until LANL issued a task order defining the scope of work and compensation to be paid to the contractor. Task orders would be awarded after competitive bidding amongst the BOA recipients. (Tuohy Dep. at 27–28; Capote Dep. at 37–40, 42–43, 45, 60–61.)

Prior to the award of the BOAs, LANL published a solicitation for bids in the December 1994 Commerce Daily Report (Pl. Trial Ex. 33), a standard industry publication. (Tuohy Dep. at 24–25; Capote Dep. at 18–19.) In this notice, the government announced that it planned on issuing at least three BOAs for LANL work and notified potential BOA recipients that it anticipated, subject to funding, awarding an aggregate of $5 million in task orders each year (roughly $1–$1.5 million per BOA recipient). The government expressly reserved the right to issue no task orders and guaranteed no minimum revenues. The solicitation notice also advised that the BOA would be for a one-year term subject to four successive one-year terms at LANL's election. In addition, the notice warned that all task orders would be awarded after competitive bidding amongst the BOA holders. (Pl. Trial Ex. 33.) Pursuant to the notice, a total of four BOAs were awarded, including one to IDMC. (Pl. Trial Exs. 34, 400 at 104, 137; Tuohy Dep. at 25–27; Capote Dep. at 21–22, 36.)

Thereafter, IDMC proposed a joint venture with Solucorp pertaining to the use of the Company's MBS process. On or about September 7, 1995 IDMC and Solucorp entered into a Joint Marketing and Operations Agreement (the "Agreement") to cross-market Solucorp's MBS remediation process. (Defs. Trial Ex. U.) Pursuant to the Agreement, profits were to be shared

equally. (*Id.* at 2.) The Agreement was executed by Mantia on behalf of Solucorp. (*Id.* at 8.)

Anticipating that soil remediation would be part of the decommissioning activities, IDMC entered into an addendum to the Agreement with Solucorp. The addendum provided that IDMC "will contract" with Solucorp for $50 million in LANL services, during the term of the BOA, through December 1997. (Pl. Trial Ex. 31.) The addendum was subject to the completion of pilot tests, treatability studies, government funding limitations and "compliance with individual task orders generated by LANL during the term of the agreement." (*Id.*) Kemprowski and Spartz worked on the addendum with IDMC. (Pl. Trial Ex. 517A at 156–57.) The addendum was executed on behalf of IDMC and by Spartz, on behalf of the Company. A second copy of the addendum was executed by Mantia. (Defs. Trial Ex. Y.)

### 2. *November 22, 1995 Press Release*

### *Background*

Mantia and others at Solucorp, including Spartz, had conversations with Jose Capote of IDMC, who represented that Solucorp would be doing $50 million of work at the site. (Trial Tr. at 672, 1006.) On November 22, 1995, the same day that the Agreement addendum was entered into, IDMC issued a press release announcing "that it has signed a $50 million contract ... with Solucorp" to use Solucorp's MBS technology at the LANL site. (Defs. Trial Ex. Z.) In its release, IDMC stated that the $50 million contract with Solucorp was pursuant to the previously issued five-year task order contract between IDMC and the LANL. (*Id.*) IDMC was comfortable with the $50 million figure and believed it to be a reasonable estimation based on the budget allocation at LANL, verbal representations made by LANL staff and the fact that the BOA was applicable throughout the site complex. (Capote 01/19/99 Tr. at 123–24; Harrigan 12/29/98 Tr. at 61 (James Harrigan of IDMC believed that $50 million was a realistic figure based on his understanding of the scope of the work available at LANL).) Solucorp received a copy of IDMC's press release on November 22 (Trial Tr. at 672; Defs. Trial Ex. AA), and sent the document over to Bernard Pinsky, the Company's outside counsel for regulatory matters, and Steve Pacquin, the "compliance guy" whose job responsibility was to assist the Company in its regulatory affairs and assess the accuracy of press releases. (Trial Tr. at 672, 676, 1007; Pacquin Tr. at 37.) A shareholder of both IDMC and Solucorp called to inquire about the IDMC press release, which raised alarms that the information about the project had to be disclosed promptly by Solucorp. (Trial Tr. at 1008.) Pinsky made the determination that Solucorp should send out a similar press release. (*Id.*) Spartz testified that he prepared a fax cover sheet to Pinsky and Pacquin enclosing the draft of the Solucorp press release for review by Pinsky and Pacquin. (Defs. Trial Ex. BB; Trial Tr. at 672.) On the second page of the enclosed proposed press release, Spartz wrote the word "approved" and initialed the document, meaning that as far as he was concerned, it was approved for Pacquin to put it on his letterhead and send it out. (Defs. Trial Ex. BB; Trial Tr. at 677–78.) Spartz approved the press release because it was similar to the IDMC contract; IDMC had put out its press release first and Solucorp had made their changes and sent it to Pinsky and Pacquin. (Trial Tr. at 678.) Pacquin and Pinsky reviewed the press release for accuracy. (Pacquin Tr. at 63–65, 67–69; Pinsky 10/13/98 Tr. at 182.)

Solucorp announced in a November 22, 1995 press release that IDMC had issued to it a "$50 million U.S. contract [with profits to be shared equally] ... for utilization of the MBS soil remediation technology at the Los Alamos National Laboratory (LANL) site in New Mexico, USA. IDMC is under a task order contract ... with the U.S. Department of Energy ... for dismantling, demolition and remediation at the Los Alamos site." The release further stated that IDMC had elected to use MBS at the LANL site through December 1997, and "[a]ctivities at the LANL site are scheduled to commence the first quarter of 1996." (SAF ¶ 11(a); Pl. Trial Exs. 30, 517A at 160–61, 210.) The press release failed to disclose that Solucorp's right to receive the $50 million was subject to the condition that IDMC first be awarded $50 million in task orders on the project.

Solucorp never did any work at LANL. Solucorp contacted IDMC regularly, almost daily, looking for samples. (Trial Tr. at 680.) When Solucorp tried to contact LANL personnel directly to find out about the status, IDMC strongly objected and threatened to sue for tortious interference if Solucorp did so again. (*Id.* at 1019–20.) Mantia learned at his investigative testimony in 1998 with the SEC that IDMC no longer had a contract with LANL, (*id.* at 1010) and thereafter Solucorp put out a press release that the project was cancelled. (*Id.* at 1010–11.)

### 3. *Quarterly Filings*

In quarterly filings for the quarters ending December 31, 1995, March 31, 1996 and June 30, 1996, made with the BCSC on May 29, June 12, and October 31, 1996, and in its 1996 Annual Report filed on November 15, 1996 with the BCSC, Solucorp stated that it had been included by IDMC in a $50 million contract. (SAF

¶ 11(c); Pl. Trial Exs. 38–41.) Herman drafted the text in each of the aforementioned public filings. (Trial Tr. at 483–84, 486; Pl. Trial Ex. 402 at 96, 114.) He did this by extracting the text from the Company's November 22, 1995 press release and inserting it into the first of the quarterly reports, and then carrying that text over into successive quarterly reports. (Pl. Trial Ex. 402 at 105–06.)

Herman testified that at the time he drafted the text in the quarterly filings, and 1996 Annual Report, he did not believe that the contract addendum (Pl. Trial Ex. 31) supported Solucorp's claim that it had been issued a $50 million contract. (Pl. Trial Ex. 30.) This is because IDMC's commitment as described in the addendum was prospective in nature and the addendum lacked essential contract terms. (Pl. Trial Ex. 402 at 105–08, 199.) Herman testified that it was not a contract, explaining: "I don't really have all the basic terms of an agreement ... it doesn't really tell me that much ... it doesn't really have that much teeth in it ...." (Pl. Trial Ex. 402 at 105, 199.) Herman testified that he repeatedly asked Kuhn for a copy of the contract. (*Id.* at 106–07.) Kuhn told Herman that the purported $50 million contract was still in negotiation (*id.*), Herman proceeded to reiterate Solucorp's claim of a $50 million contract in its quarterly filings and 1996 Annual Report. (*Id.* at 93–95, 106–07, 116, 199.) Herman also continued to represent in each filing that the $50 million contract was expected to take two years to complete, without any regard to the fact that the parties' contract addendum, by its terms, was due to expire in December 1997. (*Id.* at 96–97.) Solucorp mailed the quarterly filings and 1996 Annual Report to its shareholders, including shareholders in the United States. Mantia signed these documents. (SAF ¶ 11(c); Pl. Trial Exs. 38–41; Trial Tr. at 1015.)

Events since November 22, 1995 cast doubt on whether Solucorp would ever perform any work on the project. Several months after the LANL project was announced, IDMC experienced financial problems due to an industry wide lack of government funding of environmental remediation projects. (Pl. Trial Ex. 517B at 243–44.) After six months to a year passed, with the December 1997 expiration date of the addendum approaching, Solucorp questioned internally whether the work would ever come to fruition. (Pl. Trial Ex. 400 at 112–13, 137–38.) By early 1998, Kuhn removed the LANL project from his monthly financial reports because a business decision was made that revenues were unlikely to be generated by the LANL project that year. (Pl. Trial Ex. 400 at 106–08, 116.)

### E.  *Poland Contracts*

#### 1.  *Background*

Solucorp securities traded on the VSE until December 1995, when the VSE suspended trading due to concerns about, among other things, Solucorp's accounting treatment of a third-party contract in its 1995 year-end financial statements. (Pinsky. 11/7/02 Dep. at 77–80; Pl. Trial Exs. 428, 429.) At the outset of the trading halt, Pinsky sent a memo concerning the trading suspension to the Company for distribution to its directors. (Pinsky 11/7/02 Dep. at 99–100; Pl. Trial Ex. 430.) In the memo, Pinsky commented that a long suspension, which in this case he anticipated could be seven to eight weeks, posed certain risks, such as a lower post-suspension trading price and resulting shareholder lawsuits, particularly in the event the Company restated its financial statements. (Pinsky 11/7/02 Dep. at 99–102, 109–10.) The trade halt in this instance lasted eight months.

While Pinsky dealt with the BCSC and VSE, the Company explored the possibility of trading on another exchange. (Pinsky 11/7/02 Dep. at 103–04, 111–12.) Solucorp then sought a market maker to make a market in Solucorp securities on the NASD OTCBB. The market maker, M.H. Meyerson & Co., Inc., submitted an application to the NASD in March 1996. (Admitted in Kuhn Answer to ¶ 26(a) of the Complt. ¶ 28(a) of the 2d Am. Complt.; not denied in Kemprowski, Mantia and Herman Answers to ¶ 26(a) of the Complt. ¶ 28(a) of the 2d Am. Complt.; Pl. Trial Ex. 54.) In anticipation of Solucorp securities beginning to trade on the NASD OTCBB, or resumption of trading on the VSE (Pinsky 11/7/02 Dep. at 97, 124, 126–27), Solucorp issued its third press release of the 1996 calendar year on April 17, 1996 (Pl. Trial Ex. 51), followed immediately by other releases. The releases were disseminated on the instructions of Kemprowski. (Pl. Trial Exs. 56, 211–13; E. Kemprowski Dep. at 30–42, 36–37, 41, 43, 50–51.) Kuhn was the person at Solucorp responsible for projects in Poland, in particular projects known as the Katowice project and the Tarnowskie Gory project. The projects were announced in a Solucorp press release, dated April 17, 1996. (Pl. Trial Ex. 51.)

#### 2.  *April 17, 1996 Press Release*

The April 17, 1996 press release announced that the United Nations ("UN") and the European Union ("EU") had "budgeted approximately $345,000 from their general fund to the Company" for testing of Solucorp's MBS in Poland. (SAF ¶ 12(a); Pl. Trial Ex. 51.) In fact, the budgeted amount was for the testing of three different technologies (one of which was MBS) and Solucorp would receive no more than $127,000. (Trial Tr. at 392.) Solucorp reiterated this erroneous claim in a quarterly report filed with the BCSC on

May 29, 1996. (SAF ¶ 12(b); Pl. Trial Ex. 58 at 4 of Schedule C.)

Solucorp further announced in the same April 17, 1996 press release concerning Poland, that MBS would be utilized for an on-site hazardous waste cleanup for the UN and a separate remediation project on a 25-acre industrial site for the EU. Solucorp did not disclose that immediate authorization was anticipated with respect to pilot projects only, and whether the EU and UN proceeded with full-fledged cleanups was contingent on the availability of funds. (SAF ¶ 12(c); Pl. Trial Exs. 51, 52, 400 at 160, 171–72, 177–78, 182, 186, 187, 188.) Kuhn was Solucorp's representative in Poland. (Pl. Trial Ex. 400 at 158–59; Trial Tr. at 329.) Kuhn received an update on the Tarnowskie Gory project on or about March 12 (Trial Tr. at 392; Defs. Trial Ex. HH) and the next day Kuhn sent a handwritten memorandum to Mantia reflecting that Haskoning (the Company's contact in Poland) was "confident in getting the project and funding," (Defs. Trial Ex. II (bottom of first page)). Kuhn had letters from AG Environmental indicating that it expected the work to go forward. (Trial Tr. at 425.) Kuhn acknowledged involvement in drafting certain portions of the April 17, 1996 press release. (*Id.* at 397–98.) The April 17, 1996 press release was issued during the period for which the VSE had suspended trading in Solucorp stock—from December 1995 to August 6, 1996. (Pl. Proposed Findings of Facts ¶ 1.[7])

### F.   *$300 million IDMC Contract*

On August 2, 1996, in anticipation of commencing trading on the NASD OTCBB, Solucorp mailed a letter to shareholders describing business developments over the course of the preceding eight months. (SAF ¶ 13(b); Pl. Trial Exs. 59, 60, 79 at SOL5487.) The letter reported that, "Solucorp has received a joint contract with IDMC Environmental to provide up to $300 million, over 10 years, of heavy metal remediation services in one of the largest military base cleanups ever contracted." (SAF ¶ 13(c); Pl. Trial Ex. 59 at NASD83.)

However, Solucorp had not received such a contract. (SAF ¶ 13(d); Trial Tr. at 551.) More than three years later, Solucorp issued a press release and Form 8–K dated March 18, 1999, stating that it "does not know of any such $300 million contract." (SAF ¶ 13(d); Pl. Trial Ex. 89 at 6; Kemprowski, Mantia, Herman and Kuhn Answers, Ex. A at 5.) Solucorp further explained in its Form 8–K that "[t]he Company assumes that the $300 million figure was a typographical error made during drafting." (SAF ¶ 13(d); Pl. Trial Ex. 89 at 6.) Mantia reiterated at trial that it was a typographical error, maintaining that it should have read "$30 million" instead of "$300 million," although he still could not identify the purported military base cleanup at issue. (Trial Tr. at 551–52.) Mantia did not draft but read and signed the August 2, 1996 letter to shareholders and caused it to be disseminated. (SAF ¶ 13(e); Trial Tr. at 548, 550–51; Pl. Trial Ex. 59.) Before signing the August 2, 1996 letter to shareholders, he circulated it to others at Solucorp, including Kuhn and Kemprowski, but no one questioned it. (Trial Tr. at 550, 552.)

In a press release dated August 5, 1996, which Mantia also signed, the Company offered to make available a copy of the newsletter to anyone interested in obtaining a copy. (Pl. Trial Ex. 60.) Solucorp's

---

7. As stated by the SEC, Solucorp's securities traded on the VSE until December 1995, and after an eight month trading suspension, Solucorp was delisted from the VSE and began trading on the NASD OTCBB on August 6, 1996.

outside counsel filed the newsletter with the BCSC on August 12, 1996. (Pl. Trial Ex. 61.) On August 6, 1996, four days after the August 2, 1996 press release, and after an eight-month trading suspension, Solucorp delisted its securities from the VSE and began trading on the NASD OTCBB. (SAF ¶ 13(a); Pl. Trial Ex. 60.) Solucorp shares commenced trading on the NASD OTCBB at $7.50 and declined to $2.00 per share by late November 1996 (Pl. Trial Ex. 88), at which point, as described in further detail below, the Company issued a press release and filed an Annual Report with the BCSC.

## G. *Doe Run Contract*

On or about August 2, 1996, Solucorp entered into two agreements with Doe Run Resources Corporation ("Doe Run"). The first agreement provided for the leasing of certain equipment by Solucorp to Doe Run. (Defs. Trial Ex. RR.) The second agreement provided for the remediation of soil at Doe Run's facility in Missouri. (Defs. Trial Ex. QQ.) On November 27, 1996, Solucorp issued a press release announcing that its completion of testing at the Doe Run's Lead Recycling Facility "provides remediation revenues of $1.68 million per year for three years and machinery leasing revenues of $180,000" under remediation and machinery leasing agreements with Doe Run. (SAF ¶ 14(a); Pl. Trial Ex. 62.) Thus, according to the press release, the total revenue anticipated under the two agreements was $5.22 million over three years. (Pl. Trial Ex. 62.)

Pursuant to the leasing agreement, Solucorp was to receive payments of approximately $165,000 over three years. Pursuant to the remediation agreement, Solucorp was to receive payments of approximately $1.6 million over three years. (SAF ¶ 14(b); Pl. Trial Exs. 63–65, 400 at 144; Trial Tr. at 562.) Accordingly, Solucorp's machinery-leasing agreement with Doe Run provided for Solucorp to receive only $55,000 per year. (Pl. Trial Ex. 64.) Under the terms of its amended remediation contract with Doe Run, Solucorp anticipated receiving approximately $525,000 per year. (Pl. Trial Exs. 65, 66, 400 at 144, 402 at 210.) Thus, under the written contracts, Solucorp anticipated receiving $580,000 per year, not $1.68 million per year. (Trial Tr. at 557.) According to defendants, this was an inadvertent error, that does not appear anywhere else in Solucorp's disclosure documents, and was corrected in the March 1999 Form 8–K report. (Defs. Trial Ex. B at 7.) Mantia read the November 27, 1996 press release, circulated it to others at Solucorp, signed the press release and ordered its dissemination. (SAF ¶ 14(c); Trial Tr. at 554–55; Pl. Trial Ex. 62.) Kuhn was the primary business contact between Doe Run and Solucorp. (Pl. Trial Ex. 517A at 69.)

## H. *Scotland Contract*

On October 30, 1995, Solucorp and John Beech Remediation Ltd. ("Beech") entered into a licensing agreement (the "Beech Agreement"). (Defs. Trial Ex. LL.) Beech was a company located in the United Kingdom involved in the demolition business. (Trial Tr. at 1013.) The Beech Agreement provided Beech with an exclusive marketing license for use of Solucorp's MBS process in exchange for royalty fees and other payments to Solucorp. (Defs. Trial Ex. LL.) Beech was awarded a contract by the City of Glasgow to carry out remediation trials for a site in the city of Glasgow. (Trial Tr. at 1014; Defs. Trial Exs. MM, NN.) Sixteen technologies were tested at the site under the auspices of Dames & Moore, a very large international consulting firm in the environmental business. (Trial Tr. at 1015.) The report from Dames & Moore recommended Solucorp's

MBS technology for cleanup of the soils. (*Id.*)

In the "Message to Shareholders" in its 1996 Annual Report, filed with the BCSC on November 15, 1996 and disseminated to shareholders, Solucorp stated that a licensee had announced two contracts to perform services in Scotland and Portugal beginning in January 1997 which "will generate a minimum royalty income [for Solucorp] of between $10.0 and $14.0 million." The same claim was reiterated in the "Corporate Profile." (SAF ¶ 15(a); Pl. Trial Ex. 40 at 1, 3.) Both the "Message to Shareholders" and "Corporate Profile" were placed at the front of the 1996 Annual Report. (Pl. Trial Ex. 40 at 1, 3.) Of the $10 to $14 million in royalties, approximately $9 to $13 million was attributable to the licensee's contract in Scotland. (SAF ¶ 15(b); Pl. Trial Ex. 71.) In its 1996 Annual Report, Solucorp failed to disclose that the licensee had not yet been awarded a contract to provide services in Scotland beyond performing tests for 18,-000 pounds sterling [approximately $30,000 U.S.].[8] (Pl. Trial Exs. 67–70, 400 at 200–01; Beech Dep. at 32–35, 70–71, 93–100.) Solucorp also failed to disclose in its 1996 Annual Report that whether the licensee ultimately secured a remediation contract in Scotland was dependent on, among other things, the availability of funding. (Beech Dep. at 71, 77–79, 83–86; Pinsky 10/13/98 Tr. at 52–53; Pl. Trial Ex. 69.)

On March 18, 1999, in a press release and Form 8–K filed with the SEC, Solucorp disclosed that no remediation contract had yet been awarded due to a lack of funding. (Pl. Trial Ex. 89 at 7; Kemprowski, Mantia, Herman and Kuhn Answers, Ex. A at 4.) Mantia signed the Message to Shareholders (SAF ¶ 15(c); Pl. Trial Ex. 40 at 3) and caused it to be disseminated with the Annual Report (Pl. Trial Ex. 401C at 477, 484–85, 489–92.)

### I. *China Contracts*

#### 1. *Background*

Smart International Ltd. ("Smart") is a closely-held Hong Kong based company. Smart was one of two companies headed by Q.B. Zheng. (Zheng 11/30/98 Tr. at 6–7.) From January 1997 through November 1998, Q.B. Zheng's son, Li Zheng, acted as a translator for his father and transmitted material back and forth between Solucorp and Smart. (Zheng 11/30/98 Tr. at 8, 22.) Following his father's death in early 2000, Li Zheng became the head of both companies. (Zheng 7/20/01 Dep. at 21–23, 117.) Smart was formed in 1997 for the purpose of producing calcium sulfide, the principal ingredient in the MBS process, for Solucorp, which was its only customer through at least July 2001. (Zheng 7/20/01 Dep. at 62; Pl. Trial Ex. 134.) Production started in or about March 1997. (Zheng 11/30/98 Tr. at 14–15, 18–19.) Smart subsequently entered into an agreement pursuant to which Solucorp licensed Smart to use Solucorp's MBS remediation process in China.

During 1997 and 1998, Solucorp issued a series of press releases regarding the licensing arrangements with Smart and purported environmental remediation projects

---

8. It was Mantia's understanding that Beech had advised Solucorp that Beech would be receiving the remediation contracts for the Scotland site. (Trial Tr. at 1016.) In fact, after the successful testing, the engineer from the City of Glasgow advised Mr. Beech that he should "keep the keys" for the site because MBS was the most successful technology based on price and performance and Beech would be awarded a remediation contract in the future. Beech Tr. at 42–43. It was Beech's understanding that the valuation of the entire contract for the site was $230 million and that the first phase of the contract was valued in excess of $14 million. (*Id.* at 92–93, 114.)

in China which Smart had contracted to perform. With respect to press releases relating to China, John Van Duzen would take the information supplied through Li or Q.B. Zheng and report it to Mantia or Spartz, not Kemprowski. (Trial Tr. at 1136–37.) Information for press releases relating to China came from Q.B. Zheng, by his son Li, usually to Van Duzen or Mantia. (Trial Tr. at 65, 68.) The information was often vague and confusing. (Trial Tr. at 68, 130.) This was apparently by design at the Chinese end of the operation because a lot of the projects were in provinces or towns run by military generals who, as a matter of saving face, did not admit to the extent of their environmental problems. (Trial Tr. at 131–32.)

### 2. *June 4, 1997 Agreement in Principle*

Solucorp and Smart entered into an agreement on June 4, 1997 regarding Solucorp's licensing of Smart to use Solucorp's proprietary MBS process in China. (Pl. Trial Ex. 78.) Solucorp announced in a press release dated June 5, 1997, that Smart, a privately-held Hong Kong company, had signed an exclusive, five-year licensing agreement for the right to produce, market and apply MBS in China. Solucorp also announced that Smart would pay a $2 million license fee during the first year of the license. (SAF ¶ 16(a); Pl. Trial Ex. 77.) According to plaintiff, the June 5, 1997 release failed to disclose that the entire agreement was preliminary, and payment of the initial license fee was contingent on, among other things: (1) Smart conducting a market survey in China to determine whether a market existed to support payment of the fee; and (2) Smart securing remediation jobs using MBS from which it could finance the fee or, alternatively, on Solucorp securing remediation jobs using MBS that would require it to purchase chemicals from Smart, thus pro-

viding Smart with funds to pay the license fee. Defendants argue that the contingencies in the agreement related to payments after the first year and were inapplicable to the payment of the initial license fee, which all parties considered to be a firm agreement. (Defs. Trial Ex. SS.)

### 3. *Reservoir and Battery Plant Contracts in China*

Solucorp announced in a press release dated December 12, 1997 that Smart and Solucorp had been "rewarded with two major contracts" in China. The contracts related to projects described more fully in a November 20, 1997 press release. One project involved designing a system at a plant in China for "full implementation by March–April 1998," which "Solucorp–Smart estimate[d] . . . will result in revenues of $400,000 per month once the system is operational." The other project involved the "testing and associated operations for remediation" of irrigation fields that was "valued in excess of U.S. $125 million [and], will take two years to complete." Solucorp further stated that, "[f]unding for this vast [second] project is established, and revenues will commence in the first quarter of 1998." (SAF ¶ 17(a); Pl. Trial Exs. 80, 81.)

Plaintiff claims that Kemprowski knew, or was reckless in not knowing, that the November 20 and December 12, 1997 press releases were materially false and misleading when issued. Kemprowski acknowledged during investigative testimony in 1998 that he provided certain information regarding the Chuan Shan reservoir and Gui Zhou battery plant projects for inclusion in the November 20, 1997 press release. (Pl. Trial Ex. 403C at 255–56, 258–59.) Memos dated November 17 and 18, 1997 from Spartz and David Porteous, respectively, were directed to Solucorp's outside public relations firm, summarizing

information about the two projects obtained from Kemprowski, who was then in China. (Pl. Trial Exs. 85, 86.) With respect to the December 12th press release, Kemprowski testified at trial: "there's a good possibility that I saw this press release before it was issued, because it does involve China." (Trial Tr. at 955.) Kemprowski was aware of the projects because Van Duzen reported back to the Company about the contracts; however, Kemprowski was not kept apprised of the contracts on a daily, weekly or other basis. (*Id.*)

On December 11, 1997, around the time the press releases were issued, Kemprowski met with Lawrence Kreisler of KBF to discuss licensing of KBF's water treatment system in China. Kemprowski told Kreisler that Solucorp already had contracts to treat wastewater at a reservoir and battery plant in China, that Solucorp's MBS technology was already being used at the battery plant, and that KBF's technology was needed to treat wastewater at the reservoir. (Trial Tr. at 12–13.) During a January 1998 meeting, Kemprowski reiterated to Kreisler that contracts had been executed concerning the battery plant and reservoir projects in China. (Trial Tr. at 23–24.) Li Zheng testified that no such contracts for full-blown remediation were ever issued. (Zheng 11/30/98 Tr. at 108–09.) Li Zheng elaborated that, while the topic of having Solucorp develop an in-line system at the Gui Zhou battery plant was discussed in November 1997 (*Id.* at 111–13), in the spring of 1998, it was determined that the battery plant project would not proceed. (*Id.* at 122–24; Pl. Trial Exs. 81, 83.) Li Zheng further testified that no contract for remediation of the Chuan Shan reservoir was issued because samples taken from the site and tested in the lab proved to be non-hazardous, and thus not in need of treatment by Smart. (Zheng 11/30/98 Tr. at 111–14, 122–23; Pl. Trial Exs. 81, 83.)

A January 6, 1998 memo from Porteous to Van Duzen and Li Zheng indicated that insiders at Solucorp had some sense of these developments as early as January 1998. It states that no samples had yet been received from the battery plant, and that the project was on hold. It further stated that December 31, 1997 tests of the Chuan Shan reservoir showed the tested material to be non-hazardous, and questioned whether the project was now abandoned. (Pl. Trial Exs. 220, 402 at 193–94.)

Plaintiff also cites communications between Kemprowski and Kreisler in support of its argument that Kemprowski was aware at the time the press releases were issued that they were false and misleading. At a December 24, 1997 Christmas party held at his home and attended by, among others, Kreisler and Li Zheng, Kemprowski told Kreisler not to mention the purported battery plant and reservoir contracts to Li Zheng. (Trial Tr. at 20–21.) Kreisler had brought a truck with him to the party for the purpose of transporting water samples from both the reservoir and battery plant sites which Kemprowski had assured him were in his possession. When he pressed Kemprowski as to when he would be provided with the samples, Kemprowski pointed to a hallway closet, claiming that the samples were there, but Kreisler left the party empty-handed. Kreisler never obtained water samples from either site. (*Id.* at 21–23.)

Additionally, after six months of escalating tensions between KBF and Solucorp regarding Solucorp's perceived failure to perform under the terms of its license agreement with KBF, Kreisler demanded that Kemprowski meet with KBF's board of directors to explain why there had been no apparent progress on remediation projects in China, including the Chuan Shan reservoir and Gui Zhou battery plant. At

a July 14, 1998 meeting of KBF's board of directors, Kemprowski admitted that there never had been any contracts. (*Id.* at 44–45.) Finally, Kemprowski testified in 1998 to knowing that projects in China had come to a standstill, and that updates regarding the status of projects should have been issued. but were not. (Pl. Trial Ex. 403C at 264–65, 268, 271.) Solucorp did not update the public until March 18, 1999, when it announced in a press release and a Form 8–K filed with the SEC that it had no contracts in China. (SAF ¶ 17(b); Zheng 11/30/98 Tr. at 123; Pl. Trial Exs. 83, 89 at 8, 403A at 48–49, 50–51, 55, 403B at 164, 403C at 264–65, 271; Kemprowski, Mantia, Herman and Kuhn Answers, Ex. A at 5.)

#### 4. *Sites in Northern China*

Solucorp announced in a March 25, 1998 press release that it had "contracted for the remediation of soils, slags and sludges at ... sites in Northern China." (SAF ¶ 17(c); Pl. Trial Ex. 82.) When asked at trial about the March 25, 1998 press release concerning contracts for projects in Northern China, Kemprowski stated: "Because the system we had in the corporation would have directed it to me, because I was involved with China. So even if I didn't have any input, the system didn't know that, so it would pass through anybody who had any involvement in this particular case in China." (Trial Tr. at 958.) However, Kemprowski was not integrally involved in the press releases relating to China. (*Id.* at 1142.) In apparent reference to the purported projects in Northern China, Kemprowski had told Kreisler in the spring of 1998 that once they got started on the battery plant and reservoir, there were thirty other sites in China for which contracts were already in hand. (*Id.* at 42–43.)

At the time the press release was issued, Kemprowski had learned from Van Duzen that Van Duzen and Q.B. Zheng had ironed out a contract concerning the Nan Yang Iron Co. ("Nan Yang") and that the company had work at sites in Northern China. (*Id.* at 959–60.) However, at the KBF board of directors meeting held on July 14, 1998, Kemprowski informed the board that the thirty contracts did not exist. (*Id.* 39–40, 44–47.) During his November 1998 investigative testimony Kemprowski was unable to identify the purportedly contracted projects in Northern China, which are referenced in the March 25, 1998 press release. (Pl. Trial Ex. 403C at 276–77.) Additionally, Li Zheng testified in November 1998 that, to his knowledge, no work at sites in Northern China had been contracted for, contrary to the statement in Solucorp's March 25, 1998 press release. (Zheng 11/30/98 Tr. at 125–31.)

#### 5. *Nan Yang Iron Co.*

In the same March 25, 1998 press release, Solucorp announced that it had also contracted to perform remediation work at another facility in China, Nan Yang. In an August 4, 1998 press release, Solucorp announced that the Nan Yang project had been approved to proceed. (SAF ¶ 17(d); Pl. Trial Ex. 84.) The defendants did not apprise the public when, two to three weeks later, the Company was informed that the project had been postponed indefinitely. (SAF ¶ 17(d); Zheng 11/30/98 Tr. at 131–33.) It was not until March 18, 1999, that Solucorp announced that the project had been postponed pending further notice, (SAF ¶ 17(d)) and that it had no contracts in China. (Pl. Trial Ex. 89 at 8; Kemprowski, Mantia, Herman and Kuhn Answers, Ex. A at 5.)

### VII. *Solucorp's Financial Statements and Representations to the Auditors*

In mid–1997, Solucorp began preparations for filing a registration statement to

register the Company's securities with the SEC under Section 12(g) of the Exchange Act. (Pl. Trial Ex. 101; Trial Tr. at 137–38, 139, 437.) Although Solucorp intended to file the registration statement in July 1997, it ultimately decided not to proceed because management thought that the Company's financial results would improve soon. (Trial Tr. at 138, 437.)

## A. *June 4, 1997 Agreement in Principle*

Kemprowski testified that he pursued a licensing agreement with Smart in June 1997, pursuant to which Solucorp would license Smart to use its MBS process in China, because "we were pretty hungry to have revenues . . . ." (Pl. Trial Exs. 403B at 306–08, 403C at 325–26.) In terms of whether those revenues would be merely amounts accrued on Solucorp's books and records, or result in cash in hand, Kemprowski testified that he anticipated a combination of both. (Pl. Trial Ex. 403C at 325–26.)

In June 1997, Q.B. and Li Zheng met with Kemprowski, Mantia and others in the board room at Solucorp's headquarters. (Trial Tr. at 77–78; Zheng 11/30/98 Tr. at 17–18, 22.) At the meeting, an agreement dated June 4, 1997 (Pl. Trial Ex. 78) was generated. (Trial Tr. at 77–78; Zheng 11/30/98 Tr. at 17–18, 21–22.) The June 4, 1997 agreement (Pl. Trial Ex. 78) "evolved from a series of bullet points." (Trial Tr. at 76–77.) Porteous, whose office was located across from the board room, was responsible for typing in relevant portions of the agreement as they were negotiated by those attending the meeting. (*Id.* at 75–77, 79–80, 83.) The document was intended to be an itemization of areas for future discussion and development into a licensing agreement, which explains why the parties' respective obligations are phrased in the future sub-junctive throughout the document. (*Id.* at 83–85.) Porteous added the caption "licensing agreement" and a signature line on the last page above which he typed the words, "This Agreement In Principle is signed this 4th day of June, 1997 by" and he added signature lines for Mantia and Q.B. Zheng. The parties signed the document on June 4. (*Id.* at 83, 85, 87; Pl. Trial Ex. 78.) Immediately after the Zhengs left Solucorp's offices following the completion and execution of the June 4, 1997, 1997 Porteous began drafting the more comprehensive document that would become the September 15 agreement. (Trial Tr. at 128, 490–91.)

At the time the June 4, 1997 agreement was signed, Porteous testified: "it was all subject to unforeseeable aspects that hadn't been thought out . . . so this was like the skeleton, if you like, of what would become a major legalese document." (*Id.* at 87.) The agreement described the parties' rights and obligations prospectively, referring, for example, to the fact that Smart *"would* obtain" certain rights. The agreement further provided that Smart would pay Solucorp a $2 million "license and signing-on fee" within the first year of the license. (SAF ¶ 19; Pl. Trial Ex. 78 at 3.) If the initial $2 million could not be entirely funded from commercial projects, payment of the fee could include the "expected profits" from Smart's exercise of 200,000 options on Solucorp securities to be granted by Solucorp to Smart. (Pl. Trial Ex. 78 at 3.) The fees for the remaining term of the license (contemplated at a minimum of five years, with an option to renew for five years) (*id.* at 1) and royalties were to be negotiated by the parties on the basis of an initial "Market Survey" to be conducted by Smart. (*Id.* at 4.) The agreement elaborated that Smart:

has sixty (60) days from the signing of this Agreement to ascertain the market viability of MBS within China. Within

six (6) months after the signing of this Agreement, Solucorp and [Smart] will negotiate the specific Annual Licensing and Royalty Fees for the full term of the Agreement. If mutually satisfactory terms cannot be agreed within this period, and if an extension of the period cannot be agreed, this Agreement would terminate.

(*Id.*)

Another clause of the agreement reiterated, "[t]his Agreement is subject to [Smart] completing a Market Survey within sixty (60) days of this date, and establishing viable operations and agreeing ongoing [sic] financial arrangements with Solucorp within a further four (4) months." (SAF ¶ 19; Pl. Trial Ex. 78 at 1.) Li Zheng testified that Smart's payment of a $2 million "sign-on and license fee" referred to in the June 4, 1997 agreement was "contingent" on the completion of a market survey, Smart establishing viable operations and the parties' finalizing the financial arrangements. (Zheng 11/30/98 Tr. at 51–52, 58.)

### 1. *Market Survey*

The provision for a market survey was in the draft presented by Solucorp to Q.B. and Li Zheng for their consideration at the June 1997 meeting. (Zheng 11/30/98 Tr. at 24–25.) Smart itself was concerned in June 1997 about whether there was in China a market for MBS that would support a license fee (*Id.* at 38–39, 50–51), and would not have proceeded with an exclusive license arrangement if it determined that the market was not good enough. (*Id.* at 49–50.) Li Zheng stated further that Smart was not obligated as of June 1997 to pay a $2 million license fee, and was not obligated to make such a payment until after it had an opportunity to study the market. (*Id.* at 3–13, 53.) When Solucorp proposed a $2 million license fee, Q.B.

and Li Zheng responded "we'll see." (*Id.* at 38.) With regard to the agreement's provision for a $2 million "sign-on and license fee" in year one, Smart's response was to say "we'll see" based on the market survey. (*Id.* at 37–38). This is consistent with Kemprowski's investigative testimony wherein he testified · that Q.B. Zheng balked at committing to paying a license fee as of June 1997 unless he had a sixty-day period in which to assess the market in China. (Pl. Trial Ex. 403B at 298, 319.) Mantia also wanted a market survey because Solucorp needed assurance that there was sufficient market to support a license fee. (Pl. Trial Ex. 401C at 531.) The minutes of Solucorp's Board of Directors' June 9, 1997 meeting, which was attended by Mantia, state: "[Director John] Van Duzen discussed Smart Technologies entering into a licensing and royalty agreement with the Company. More work is required to finalize the agreements including two month market survey." (Pl. Trial Ex. 79 at SOL5529.)

On returning to China after entering into the June 4, 1997 agreement and before returning to school in late September 1997, Li Zheng spent the next three months engaged with his father, brother and others in surveying the market for Solucorp's environmental remediation process in China. (Zheng 11/30/98 Tr. at 25–28, 31.) Smart communicated with Solucorp about the progress of its market survey in the sense of discussing potential projects and the capabilities of MBS to handle certain problems. (*Id.* at 48; Defs. Trial Ex. TT.) It was not until October 1997, that Smart completed the market survey referred to in the June 4, 1997 agreement. (Zheng 11/30/98 Tr. at 25–28, 31, 34–35, 37, 66; Pl. Trial Exs. 401C at 531–33, 403B at 317–18.) Solucorp expressly disclosed this in a newsletter issued on September 25, 1997, which stated, in relevant part, that the annual fees, be-

yond a $2 million fee for year one, and royalties were to be agreed upon "after a detailed market survey is completed in October." (Jedynak Dep. at 27–30; Pl. Trial Ex. 106 at CW1985.)

### 2. *Viable Operations*

The June 4, 1997 agreement's requirement that Smart establish viable operations meant that Smart had to be able to make the chemicals used in the MBS process and to be able to use MBS. (Pl. Trial Ex. 401C at 533–34; Zheng 11/30/98 Tr. at 34–35.) Li Zheng testified that, at the time the agreement was entered into, Smart did not have any familiarity with MBS technology. (Zheng 11/30/98 Tr. at 34–35.) Smart's efforts to establish viable operations under the agreement continued after Li returned to school in September 1997, and involved Smart's gaining familiarity with the MBS process and procuring the necessary equipment. (*Id.* at 34–36; Pl. Trial Exs. 104, 105, 401C at 533–34.)

### B. *Finalization of the License Agreement*

On October 21, 1997, Solucorp received $150,000 in cash from Smart. (Pl. Trial Exs. 109, 401C at 545.) In an October 22, 1997 press release issued the next day, Solucorp announced that:

> the Company has received $US 200,000 from Hong Kong based Smart International Ltd. as confirmation of Smart's commitment to obtaining an exclusive license to market and apply Solucorp's Molecular Bonding System (MBS ®) in the Peoples' Republic of China. This initial payment was secured after Smart completed an extensive market survey ... Solucorp officials will arrive in China on November 9, 1997, to finalize terms of the agreement with Smart International, which is scheduled to span a minimum of five years ....

(SAF ¶ 20; Pl. Trial Exs. 110, 401C at 542–43.)

On October 15, 1997, the Company's outside auditor asked for copies of any licensing agreement with Smart during its audit of Solucorp's June 30, 1997 financial statements. (Trial Tr. at 136–37, 443–44; Stewart Dep. at 41, 44–45; Pl. Trial Ex. 107.) On October 15 and 24, 1997, respectively, Herman and the Company's controller responded, writing that the only agreement with Smart was the June 4, 1997 agreement. This is consistent with the press release's representation that a license agreement had yet to be finalized. (Pl. Trial Exs. 108, 111; Trial Tr. at 445–46; Stewart Dep. at 44–47.) Solucorp representatives, including Kemprowski and Mantia, traveled to China in November 1997, as announced in the Company's October 22, 1997 press release. (Trial Tr. at 93; Zheng 11/30/98 Tr. at 75–76; Pl. Trial Exs. 110, 113 132.) Li Zheng acted as interpreter during the trip. (Zheng 11/30/98 Tr. at 76.) The discussion of "license and fees" with Q.B. Zheng was listed on a trip itinerary addressed from Mantia to Van Duzen. (Pl. Trial Ex. 112.) Li Zheng recalled that Solucorp representatives did broach the topic of license fees and royalties during one meeting in China. (Zheng 11/30/98 Tr. at 76–77.) Mantia testified during his investigative testimony in 1998 that the Company's October 22, 1997 press release was consistent with his recollection that Solucorp and Smart had not yet finalized the terms of the exclusive licensing agreement prior to the trip to China on November 9, 1997. (Pl. Trial Exs. 110, 401C at 541, 544.) Kuhn recalled Kemprowski informing him on his return from China that Solucorp had ironed out details of a supply and licensing agreement with Smart. (Pl. Trial Ex. 400 at 249–50.) As detailed below, the negotiation of the

parties' final licensing agreement continued through December 1997.

### 1. *MacKay's Limited Review*

The September 30, 1997 financial statements stated that they were prepared in accordance with Canadian generally accepted accounting principles ("GAAP")(SAF ¶ 29) for purposes of filing them with the BCSC. Herman asked Solucorp's then outside auditors, MacKay & Partners ("MacKay"), to reconcile the interim financial statements to U.S. GAAP for inclusion in a filing with the SEC. (SAF ¶ 29; Trial Tr. at 139, 448–49.) In this connection, MacKay conducted a limited review of the September 30, 1997 financial statements. Glenn Ohlhauser, a Chartered Accountant in Canada, was the MacKay partner overseeing the review. (SAF ¶ 30; Trial Tr. at 136, 140.)

GAAP is the entire body of principles that accountants use in deciding how to report transactions in the financial statements. (Trial Tr. at 736.) A review is distinguishable from an audit in that the auditor makes inquiries of management without seeking third-party confirmations. (Trial Tr. at 140–41; Stewart Dep. at 54–55.) There was no regulatory requirement that MacKay conduct a review; MacKay undertook it to assure itself that there were no material misstatements. (Trial Tr. at 140; Stewart Dep. at 54–55.) The review in this instance was limited in that MacKay focused on those aspects of Solucorp's financial statements which in the past had given rise to audit adjustments, *i.e.*, adjustments to draft financial statements prepared by management based on additional information obtained or errors detected during the audit. (Trial Tr. at 141.) MacKay focused on Solucorp's accrual of license fees and, more particularly, its accrual of the Smart license fees. (*Id.* at 141–42, 145.)

In mid-December 1997, when MacKay asked Herman about the basis of the Smart license fee accrual, Herman directed MacKay to the June 4, 1997 agreement. (Trial Tr. at 141–42; Pl. Trial Ex. 78.) Herman was aware of the June 4, 1997 agreement's provision for a market survey, and testified that recognition of revenue based on the June 4, 1997 agreement would not have been appropriate until "after that contingency was lifted." (Trial Tr. at 450–51.) He decided to recognize revenue based on the June 4, 1997 agreement, which Herman considered to be a firm commitment for a $2 million license fee in the first year, with the further knowledge that the market survey referred to in the June 4, 1997 agreement had been completed. (*Id.* at 473, 501.) On reviewing the agreement, the MacKay team conducting the review "came to the conclusion that the agreement was not at that time an actual agreement, that it was what we refer to as a letter of intent. It was an agreement that documented an intention to form an agreement at some future point . . . ." (*Id.* at 142–43.)

The MacKay team based their conclusion, in part, on the language of the June 4, 1997 agreement indicating that the license had not yet been finalized, including: (1) the reference above the signature line to the document being an "agreement in principle" (Trial Tr. at 143; Pl. Trial Ex. 78 at 4); (2) the use of the future tense throughout the document to describe the parties' prospective obligations and rights (Trial Tr. at 143–45; Pl. Trial Ex. 78 at 1–3); (3) the agreement's provision that it was subject to, among other things, Smart completing a market survey, which indicated that there was a condition to be fulfilled before the license agreement would be finalized (Trial Tr. at 144; Pl. Trial Ex. 78 at 1); (4) the itemization of "specific subjects for license terms" on page 2 of the

agreement, indicating that the terms were not yet fixed (Trial Tr. at 144); (5) the qualification on page 2 of the agreement that this itemization was "not necessarily to be regarded as a complete listing" (*id.*); (6) the agreement's reference to the fact that the parties were still negotiating minimum annual tonnage requirements (Trial Tr. at 145; Pl. Trial Ex. 78 at 3); and (7) the provision for the market survey to be completed within sixty days of the signing of the agreement, with the parties to negotiate the "specific Annual Licensing and Royalty Fees for the full term of the Agreement" within six months after the signing of the agreement. (Trial Tr. at 145; Pl. Trial Ex. 78 at 4.) Additionally, the MacKay team found the provision for a $2 million "license and sign-on fee" during the first year of the license vague and confusing because there was no indication as to how to allocate the amount between the license fee and the sign-on fee. (Trial Tr. at 145; Pl. Trial Ex. 78 at 3.) Lastly, the MacKay team did not understand the provision relating to the application of "the expected profits" from Smart's exercise of all or some of 200,000 options to be granted to Smart by Solucorp toward the first-year license fee "in the event that its Year #1 payments cannot be entirely funded from commercial project sources." This provision continued that, "in the event of the Options being exercised in the first year, the Profit Percentage derived from the exercising must be applied to the total of the Year #1 Licensing Fee." (Trial Tr. at 145–46; Pl. Trial Ex. 78 at 3.) Ohlhauser testified, "[f]rankly, I have no idea what that meant." (Trial Tr. at 146.)

### 2. *MacKay Informs Herman of Material Misstatement*

On December 18, 1997, Ohlhauser informed defendant Herman in a memo that the June 4, 1997 agreement between Solucorp and Smart was too vague and contingent to support revenue recognition. Moreover, Ohlhauser told Herman that the September 30, 1997 financial statements were materially misstated as a result. (SAF ¶ 31; Trial Tr. at 146–47; Pl. Trial Ex. 116 at SOL3829.) On December 18, 1997, in a follow-up telephone conversation, Herman told Ohlhauser that he should have discussed his concerns with Herman orally rather than putting them in writing. (Trial Tr. at 450; Pl. Trial Ex. 122.) Herman also told Ohlhauser, during the telephone conversation on December 18, 1997, that the parties had spent the last several months of 1997 finalizing the terms of a license agreement, and had traveled to China in the fall of 1997 for that purpose. (SAF ¶ 32; Pl. Trial Ex. 122; Trial Tr. at 454.) According to Ohlhauser, "at that point, Mr. Herman was talking about the agreement that he was still waiting for new terms, he wasn't able to produce this agreement at that time." (Trial Tr. at 152–53.) At the trial, Herman identified the parties' license agreement dated as of September 15, 1997 (Pl. Trial Ex. 121) as the final license agreement which the parties spent the last several months of 1997 negotiating. (Trial Tr. at 454.)

Herman further told Ohlhauser that the parties had agreed to Smart paying the license fee in quarterly installments of $500,000 and that Smart had already paid $200,000 and was expected to pay an additional $300,000 by year end. (Pl. Trial Ex. 117 at 1.) Herman also told Ohlhauser that if the SEC asked Solucorp to amend its financial statements, Herman would consider doing it then, but not at the point Ohlhauser was raising the issue. (Trial Tr. at 149, 465; Pl. Trial Ex. 117 at 2.) Ohlhauser directed Herman to apprise the Company's outside counsel of his concerns by sending counsel a copy of Ohlhauser's

December 18, 1997 memo. (Trial Tr. at 149–50.)

On December 19, 1997, upon learning that Herman had not apprised counsel, Ohlhauser participated in a conference call with Herman and counsel to discuss the matter. Counsel deferred to Herman's assurances that revenue recognition was appropriate. (*Id.* at 149–50; Pl. Trial Ex. 118 at 3.) Ohlhauser told Herman that Solucorp's financial statements should be restated. Solucorp and Herman refused. (SAF ¶ 33; Pl. Trial Ex. 118.) Herman told Ohlhauser that MacKay should discontinue its limited review of the September 30, 1997 financial statements. (Trial Tr. at 150–51.)

Solucorp proceeded to file the registration statement with the SEC on December 22, 1997. (Trial Tr. at 460; Pl. Trial Ex. 300.) The only agreement relating to the licensing of Smart that was referred to in the registration statement is the June 4, 1997 agreement. Solucorp was required to attach copies of any significant contract in existence as of the filing, and to list each contract as an exhibit to the registration statement. (Trial Tr. at 153–54, 747–48.) Among the material contracts attached to the filing is the June 4, 1997 agreement. (Pl. Trial Ex. 300 at 79, Item 10.3.) The registration statement elsewhere refers to the June 4, 1997 agreement, stating that "it is subject to an assessment of the market in China," without mentioning the agreement dated September 15, 1997. (Trial Tr. at 462–63; Pl. Trial Ex. 300 at 11.) Herman acknowledges that he probably drafted this text. (Trial Tr. at 464.) Ohlhauser testified that, up through the date of his testifying at trial, no new information had come to his attention to cause him to change his view that the September 30, 1997 financial statements were materially misstated. (*Id.* at 223.)

### 3. *Backdating of Final License Agreement*

Li Zheng visited Solucorp's offices during the last two weeks of December, beginning on or about December 18, 1997. (Zheng 11/30/98 Tr. at 77–78, 87–88.) During the week of December 18, 1997, Mantia showed Li a copy of the June 4, 1997 agreement, pointing out to him the reference therein to its being an agreement in principle. (Zheng 11/30/98 Tr. at 79–80; Pl. Trial Ex. 78 at 4.) Mantia explained to Li that Solucorp wanted to enter into a final agreement with Smart, and provided Li with a draft agreement for Q.B. and Li Zheng to review. (Zheng 11/30/98 Tr. at 81–82). Q.B. and Li Zheng took "a lot of things out . . . [b]ecause they have a lot of restrictions on this and that." (*Id.* at 82–83). Porteous acted as scribe, editor and secretary with respect to the parties' final license agreement. (Trial Tr. at 109–11; Pl. Trial Ex. 121.) He incorporated the Zhengs' changes into the draft agreement. (Zheng 11/30/98 Tr. at 83–84.) Multiple drafts of the final license agreement were generated, including Drafts # 6 and # 9, described in further detail below. (Pl. Trial Exs. 119, 120.)

### a. *Draft # 6*

Porteous testified that Draft # 6 (Pl. Trial Ex. 119) bears a date and time stamp of "12/29/98 11:11 AM," because that is when he printed it from his computer for production to the SEC in its investigation. Porteous further testified that the date stamp the document bore prior to his printing it on December 29, 1998 was December 24, 1997, which indicated the last date on which he had printed the document. Porteous recalled that he had printed the document on December 24, 1997 for Li Zheng. (Trial Tr. at 98, 101–03, 106; Pl. Trial Ex. 119.)

#### b. *Draft # 9*

Porteous identified Draft # 9 as one of the series of drafts of the final licensing agreement between the parties, except that the margin width differed from the one that he used in drafting the document. (Trial Tr. at 117–18; Pl. Trial Ex. 120.) The first page bears a date and time entry similar to the one that Porteous placed on other drafts. Based on the entry appearing on the first page, Draft # 9 (Pl. Trial Ex. 120) was printed out on December 27, 1997 at 1:18 p.m. (Trial Tr. at 118.)

Draft # 9 bears handwritten notes and textual changes in Chinese characters and in English that were obviously placed on the document after 1:18 p.m. on December 27, 1997. (*Id.* at 122.) Li Zheng testified that the Chinese characters appeared to be in his father's handwriting. (Zheng 7/20/01 Dep. at 130–35, 138; Pl. Trial Ex. 120.) Porteous testified that certain of the changes in English appeared to be in Li Zheng's handwriting. (Trial Tr. at 119.) The notes in Chinese appear to be Q.B. Zheng's summary of comments from an Attorney Wu. Q.B. Zheng noted "Attorney Wu's opinion" in the upper left-hand corner of the second page of the draft agreement, and further down the same page references "the attorney's opinion." (Pl. Trial Ex. 120 at SIL363 (certified English translation attached thereto).) Certain of the handwritten changes appearing on Draft # 9 are reflected in the text of the final executed agreement between the parties. For example, paragraph 8.2 of Draft # 9, relating to Smart's payment of the license fee with prepaid inventory in certain circumstances, was hand-edited to include the clause "or adverse market change in China (as determined by SMART)" as one of those circumstances. (Pl. Trial Ex. 120 at SIL367.) This clause appears in paragraph 8.2 of the final agreement. (Pl. Trial Ex. 121 at

SOL3804.) The handwritten change "(except for its own default)" on page 8 of Draft # 9 (Pl. Trial Ex. 120 at SIL369) is reflected in paragraph 13.1 of the final agreement. (Pl. Trial Ex. 121 at SOL3806.)

Porteous testified that he typed the text of paragraphs 8.2 and 13.1 of the final agreement. (Trial Tr. at 114–16.) He further testified that Mantia and Kemprowski were involved in reviewing the agreement. (*Id.* at 110–11, 113.)

Li Zheng testified that after the editing process was completed, Mantia signed the final agreement and entered his signature date as September 15, 1997 and then sent it to Q.B. Zheng for his signature. (Trial Tr. at 563–65; Zheng 11/30/98 Tr. at 77–79; Pl. Trial Ex. 121 at SOL3809.) Either Mantia or Van Duzen told Li Zheng to have his father give his signature date as September 15, 1997. Li and his father both asked why a September 15, 1997 signature date should be given, and were told that it was because the final agreement was merely a continuation of an existing agreement. (Zheng 11/30/98 Tr. at 78–79, 86–90.) The Zhengs' view was that they did not really care what the reason was for giving a September 15, 1997 signature date (Zheng 11/30/98 Tr. at 88–89) because "paper doesn't really mean that much." (*Id.* at 89–90.) Q.B. Zheng signed the agreement with a September 15, 1997 signature date and faxed and express mailed the fully executed agreement to Solucorp. (*Id.* at 86; Pl. Trial Ex. 121 at SOL3809.)

On two occasions during the spring of 1998, Herman confirmed Li Zheng's account of the timing of when the agreement dated as of September 15, 1997 was actually finalized and executed in writing. First, in connection with the Company's filing of a Form 10–K with the SEC in the spring of 1998, outside counsel asked Herman to provide a list of all agreements executed

*after* September 30, 1997. (Trial Tr. at 530–31; Pl. Trial Ex. 511 at SOL3168.) Among the agreements identified by Herman in a fax dated March 20, 1998 to counsel was the agreement dated as of September 15, 1997, which Herman described therein as having been "finalized" on December 30, 1997. (Trial Tr. at 526; Pl. Trial Ex. 511 at SOL3168.) Second, in a memo to the file drafted in May 1998 memorializing his conversation with Ohlhauser the previous December 1997, Herman wrote:

> At the current time [*i.e.*, December 18, 1997] you should have in your files the agreement in principle for the Smart License Agreement .... However, for the past several months we have been finalizing an exclusive licensing agreement with Smart which reflects a commencement date of 6/1/97, an execution date of 9/15/97, but it was actually executed (according to the fax date) on or before 12/30/97.

(Trial Tr. at 452–53; Pl. Trial Exs. 122, 402 at 176–77.)

During his investigative testimony in August 1998—less than twelve months after the events at issue—Mantia repeatedly denied having any recollection of when he signed the agreement—whether it was summer, fall or winter of 1997, let alone September 15, 1997. (Pl. Trial Ex. 401C at 523–24, 527, 554.) While he initially maintained at trial that he "was pretty sure [he] signed it on or about [September 15, 1997]" (Trial Tr. at 562, 564), he acknowledged that he had no personal recollection of having done so, and that someone had told him that is when he signed it. (*Id.* at 581.) Mantia did acknowledge at trial that, as he had inserted the September 15, 1997 signature date under his signature prior to sending the agreement to Q.B. Zheng (*Id.* at 562; Pl. Trial Ex. 121 at SOL3809), Q.B. could not have received

it and signed it on the same day. (Trial Tr. at 565.) Mantia denied knowing when Q.B. Zheng signed the agreement (*Id.* at 567), however, or why Q.B. Zheng also gave his signature date as September 15, 1997. (*Id.* at 565.) Porteous testifies that it was "unthinkable" for Mantia not to have discussed the agreement dated as of September 15, 1997 with Kemprowski, because "it was too important a document for someone of Joe's standing not to have been given a copy by" Mantia. (*Id.* at 110–11.)

According to defendants, the document was misfiled or misdirected, because sometime in December Herman advised Mantia that he did not have a signed copy of the agreement and needed to obtain it. (*Id.* at 1030.) Mantia called Van Duzen and asked him to get another copy of the contract. (*Id.*) Van Duzen called back and said that Q.B. did not have a copy of the agreement because it was signed in the field. (*Id.*) Mantia suggested printing out another copy and having Q.B. resign it. (*Id.*) This was difficult because they could not locate the last draft of the document. (*Id.*) Various drafts were printed off the computer that did not reflect the final version, which was located on a disk that could not be found, and Li Zheng began to go through a redraft. (*Id.*) Herman then found a copy of the original with Mantia's signature on it. (*Id.*) This copy was then faxed to Q.B. Zheng to have him execute it. (*Id.*) Q.B. Zheng signed the document again in late December 1997 and again dated it "9–15–97" below his signature. (*Id.*) The reexecuted document was admitted into evidence as Trial Ex. VV. (Trial Tr. at 1032.) Sometime in 2002, while looking for an invoice from Smart, Mantia found the original signed document (Defs. Trial Ex. UU) in a miscellaneous folder in the accounting office. (Trial Tr. at 1031.) Defendants maintain that there would have been no point to "backdating" the date on the signature page because the

document already stated on its face on the first page that it was effective "as of September 15." Olhauser concluded, during his cross examination that it was possible that the agreement could be signed on one date but be deemed effective at an earlier date. (*Id.* at 191.)

### 4. *Agreement Dated as of September 15, 1997*

The term of the final license agreement was "ten (10) years, commencing on June 1, 1997, with an automatic renewal for an additional ten (10) years, unless both parties agree[d] in writing to terminate." (Pl. Trial Ex. 121 at SOL3801, ¶ 5.0.) The annual license fee was set at $2 million, to be paid in installments of $500,000 quarterly, except during the first year of the license. For that year, paragraph 4.0 of the agreement set forth an irregular payment schedule as follows: "In year one of this Agreement (June 1, 1997 through May 31, 1998), SMART agrees to pay SOLU-CORP $2,000,000.00 ($200,000 by July 31, 1997; $200,000 by September 30, 1997; $200,000 by November 30, 1997; $400,000 by January 31, 1998; $500,000 by March 31, 1998; and $500,000 by May 31, 1998.)" (Pl. Trial Ex. 121 at SOL3800.)

The agreement further contemplated that Smart—at its own election and in limited circumstances—could pay the license fee with "pre-paid inventory" of calcium sulfide, which it manufactured for Solucorp under a March 1997 supply agreement, in lieu of cash. Specifically, paragraph 8.2 of the agreement provided:

> It is further agreed, in the event of a merger or acquisition of either party or adverse market change in China (as determined by SMART), any monies owed to SOLUCORP for license or royalties either past, present, or future by SMART, can be converted at SMART's option, to pre-paid inventory of the pri-

mary MBS ingredient. Demand for delivery of pre-paid inventory cannot exceed ten percent (10%) of SMART's monthly production unless agreed in writing by SMART.

(Pl. Trial Ex. 121 at SOL3804.)

### 5. *Ohlhauser's Inquiry Into Purported Backdating*

In late 1997, Solucorp changed its fiscal year-end from June 30 to December 31. (SAF ¶ 36.) MacKay audited Solucorp's financial statements for the six-month transition period ending December 31, 1997 for inclusion in a Form 10–K to be filed with the SEC. (SAF ¶ 37.) Herman received a February 27, 1998 memo from Ohlhauser stating that "GAAP (both Can[adian] and US) states that 'revenues from the use of others of enterprise resources should be recognized when reasonable assurance exists regarding measurement and collectibility.'" Ohlhauser commented that at that time he lacked the information necessary to assess the appropriateness of recognizing Smart license fees as revenue. He also requested to see the terms of the final agreement negotiated by the parties. (*Id.* ¶ 38.) On or before March 10, 1998, Herman provided Ohlhauser with a copy of the agreement dated as of September 15, 1997. (Trial Tr. at 464; Pl. Trial Ex. 125.) In a memo dated March 10, 1998, Ohlhauser told Herman that:

> I am still concerned with accounting for license agreement with Smart. This agreement is dated September 15, 1997, however it was not referred to on the 10–KSB [filed with the Commission on December 22, 1997] .... It appears that this agreement has been 'backdated' and I don't know exactly how you reconcile this with information contained in the first 10–KSB. I don't know what SEC may say if these new 'facts' aren't consistent with items previously filed.

(Trial Tr. at 151–52, 464; Pl. Trial Ex. 125.)

With regard to his memo's reference to "information contained in the first 10–KSB," Ohlhauser testified that he had looked at the list of the Company's material contracts included as part of the registration statement filed with the SEC on December 22, 1997 (Pl. Trial Ex. 300 at 79) and noticed that the list referred to the June 4, 1997 agreement and not the agreement dated as of September 15, 1997. (Trial Tr. at 153–54.) Ohlhauser testified that issuers were required to attach various exhibits to a registration statement, including material agreements in existence at the time of the filing, and to list the attachments. (*Id.*) The omission prompted his inquiry of Herman. (*Id.* at 154.) Herman responded that he would worry about the backdating if it became an issue with the SEC down the road. (*Id.* at 151–52, 464–65.)

### C. *Collectibility of License Fee for Reporting Periods Through December 31, 1998*

As of December 31, 1998, Solucorp recorded as license fee payments: (1) $150,000 in cash paid on October 21, 1997 (Pl. Trial Ex. 109); (2) an offset on or about December 29, 1997 of $350,000 in license fees against an amount payable by Solucorp to Smart for future production of calcium sulfide (Trial Tr. at 154–55; Defs. Trial Ex. ZZ)[9]; and (3) an offset in May 1998 of approximately $618,000 in license fees against an amount payable by Solu-

corp to Smart for future production of calcium sulfide. (Pl. Trial Ex. 303 at 33 n. 3.) The agreement dated September 15, 1997 terminated effective December 31, 1999. (SAF ¶ 52.) From June 1997 through at least the spring of 1999, Smart's payment of a license fee was dependent on either: (a) Smart's obtaining remediation jobs using MBS in China; or (b) Solucorp's obtaining remediation jobs using MBS. The latter meant that Solucorp would purchase chemicals from Smart, thereby enabling Smart to pay the license fee with cash or to offset the license fee against Solucorp's accounts payable for calcium sulfide. (Trial Tr. at 476–77.)

Kemprowski testified that since June 1997, Solucorp personnel have known that Smart could not pay a license fee unless the parties obtained remediation jobs. (Pl. Trial Ex. 403B at 270–71, 292–93, 297, 298, 319, 323, 351, 352.) Kemprowski testified that the issue of "how [Smart was] going to pay a [license fee] until they got some projects" prompted Solucorp to contemplate in the June 4, 1997 agreement the issuance of 200,000 options to Smart as a means of defraying the expense. (Pl. Trial Ex. 403B at 296–97.)

At trial, Herman testified that he was aware that the ability of the parties to offset amounts owed to each other was dependent on the parties securing remediation contracts. (Trial Tr. at 476–77.) However, offsets were not assured, because Smart was under no obligation to continue producing calcium sulfide. The

---

9. At trial, defendants introduced a letter dated October 20, 1997 purporting to be from Li Zheng which stated that Smart was wiring $150,000 in cash and granting Solucorp that day a $50,000 credit toward the future purchase of calcium sulfide, and that the total $200,000 was a partial payment of the first year license fee under the June 4, 1997 agreement. (Defs. Trial Ex. WW.) A second letter

from Smart dated December 29, 1997 (Defs. Trial Ex. ZZ) states that Smart that day granted a credit of $350,000 toward Solucorp's purchase of future inventory, and that credit was to be applied toward the first year license fee, reducing the balance to $1.5 million. This would be correct only if there was no credit of $50,000 in October 1997.

agreement dated September 15, 1997 provided for offsets only in limited circumstances, and conferred on Smart the right to decide in those circumstances whether there would be an offset. (*Id.* at 156, 217, 219.) During MacKay's audit of Solucorp's December 31, 1997 financial statements, Ohlhauser repeatedly asked Herman for information regarding Smart's wherewithal to pay the license fee. (Trial Tr. at 158, 162–63, 165–66, 472; Pl. Trial Exs. 123, 130.) Ohlhauser asked Herman for Smart's financial statements. (Trial Tr. at 158, 472.) Herman refused because he was told it would be humiliating to ask Smart for them. (*Id.* at 159–60, 473.) Ultimately, the only information Herman was able to provide Ohlhauser were photos of meetings among representatives of Solucorp, Smart and Chinese government officials, and pamphlets on the environmental remediation efforts by the Chinese government. (*Id.* at 473; Pl. Trial Exs. 131, 132.) MacKay assigned no weight to this material. (Trial Tr. at 160–62.)

MacKay was similarly unable to obtain financial statements or comparable data for Smart during its audit of Solucorp's December 31, 1998 financial statements. (*Id.* at 160.) When shown at trial Smart's financial statements for the fiscal years ending March 31, 1997 and 1998, Ohlhauser testified that the information contained therein was not consistent with representations made to him by Herman and possibly by Mantia. Specifically, Herman, and possibly Mantia, had told Ohlhauser in connection with MacKay's assessment in 1997 and 1998 of the collectibility of the license fees that Smart was a company of some size with a good size manufacturing plant. (*Id.*) Ohlhauser testified that the financial statements did not reflect the plant and equipment that one would expect of a manufacturer. (*Id.* at 166–69; Pl. Trial Exs. 135, 143.) Ohlhauser further testified that the information in the finan-

cial statements, had he known it during the audits of Solucorp's financial statements, would have caused him to evaluate differently the recognition of the Smart license revenue. (Trial Tr. at 183–84.)

Defendants argue that the Smart obligation was collectible, citing the following testimony elicited at trial. Herman knew that Smart was Solucorp's primary supplier of calcium sulfide, the key ingredient in the MBS process, and that Smart was manufacturing and stockpiling the chemical for Solucorp and was building up a payable, just like Solucorp was building up a receivable (from the license fee)—presenting the opportunity for offsets. (*Id.* at 476, 504.) Solucorp had received $150,000 in cash as well in October, adding to his comfort. (*Id.* at 498, 504.) Herman had met the Zhengs and believed that Smart was reputable. (*Id.* at 506.) He asked Mantia to obtain Smart's financial statements, but those were not obtained because Van Duzen, the liaison with Smart, made clear that asking a Chinese company for a financial statement was a cultural slap in the face and tantamount to saying you did not trust them. (*Id.* at 159, 474, 506, 1043.)

MacKay issued unqualified opinions for the financial periods ending December 31, 1997 and December 31, 1998, meaning the firm had no exceptions to report. (*Id.* at 228, 509.) The firm decided that the elements necessary for revenue recognition were in place. (*Id.* at 204.) They thought that the agreement was valid and that within that agreement there was a measurement basis that could be accurately used and that there was a reasonable assurance of collection. (*Id.*) That judgment was made for the year-end in 1997 and 1998. The audits for those periods went through a second partner review process. (*Id.* at 224.)

Olhauser's initial objections to the recognition of revenue in the unaudited September 30 statements were satisfactorily addressed and he "backed off" his initial concerns. (*Id.* at 524.) Olhauser ultimately stated that Herman's accounting treatment for the period ending September 30, 1997 was not unreasonable. (*Id.* at 224.)

According to Olhauser, the primary step in determining collectability was to confirm the amount with Smart, with Smart concurring that the agreement was valid and that the amount was owed. (*Id.* at 158.) This was probably the most significant evidence of collectability. (*Id.* at 196.) Smart repeatedly acknowledged its obligations to pay the $2 million year-one license fee in correspondence to Solucorp (Defs. Trial Exs. WW, ZZ), and in formal confirmations made in connection with the audits. (*Id.* BBB, DDD.) The written confirmations by Smart provided evidence to the auditors of the validity and existence of the agreement. (Trial Tr. at 135–36.) Olhauser also testified that he looked at what payments had been made, and tried to get some information regarding the financial ability of Smart to pay. (*Id.* at 159.) Herman advised him at the time that Smart was a fairly reputable company of some size, with a fairly good size manufacturing plant and a large number of employees and that the principals were well-connected in the Chinese government. (*Id.* at 160.) This was confirmed by the testimony of Van Duzen that Smart had probably 40 to 50 employees in Hong Kong, and that the major part of the company is in mainland China. (*Id.* at 1154.) Van Duzen knew that Smart owned a number of plants in various areas, had seen the plants and knew the number of employees they had in China. (*Id.* at 1134.) He had seen very substantial money transactions in China by Q.B. Zheng and his business partners, and he had no doubt about Smart's financial strength in China. (*Id.* at 1135–36, 1183.)

Olhauser also testified that the offsets Solucorp was using to recognize revenue were appropriate. (*Id.* at 206.) They were mutually agreed on by the companies. (*Id.* at 206; Zheng 7/20/01 Dep. at 48 (when there was an offset, title passed to Solucorp even if chemical was maintained in China).) Olhauser also considered the critical nature of the calcium sulfide to the MBS process in making the determination that the revenue should be accrued and be deemed collectable. (Trial Tr. at 197.)

Solucorp subsequently retained another accounting firm, Israeloff Trattner, to audit its financial statements for the 1999 and 2000 fiscal years. In the course of conducting the audits, Israeloff Trattner informed Mantia that the Company's revenue recognition of Smart license fees for the periods ending December 31, 1997 and 1998 was improper because collectibility was not reasonably assured, and that the Company should restate its financial statements. (*Id.* at 227–32, 233, 236–37.) Israeloff Trattner discontinued the engagement because of outstanding amounts due from Solucorp. (*Id.* at 237.)

### D. Solucorp's Recognition of Smart License Fees—Conformance With GAAP

Sally Hoffman, CPA, Certified Fraud Examiner ("CFE"), testified as an expert witness on behalf of the SEC. (*Id.* at 729.) She is a member of the American Institute of Certified Public Accountants ("AICPA"), a professional body of all certified public accountants in the United States.[10]

---

10. Ms. Hoffman has served on all three senior technical committees of the AICPA. (Trial Tr. at. 730.) The committees are comprised of people that are technical experts. (*Id.* at

(*Id.* at 730.) The Court found her well qualified and fully credible.

According to Ms. Hoffman, Solucorp's recognition of Smart license fees as revenue in its financial statements for the periods ending September 30 and December 31, 1997 and March 31, June 30, September 30 and December 31, 1998 was not in conformance with GAAP. (*Id.* at 734–35.) GAAP imposes two basic criteria for revenue recognition. The first is that a transaction must be completed, and there must be no contingencies associated with revenue recognition as of the close of the reporting period. (*Id.* at 737–38, 812–13, 814.) The second is that revenue must actually have been "realized" or must be "realizable", *i.e.*, collectible. In order for the revenue to be deemed collectible, the party from whom monies are sought must either have cash or assets that are readily convertible into cash. (*Id.* at 738.)

### 1. *September 30, 1997 Financial Statements*

According to Ms. Hoffman, recognition of any license fees during the quarter ending September 30, 1997 was improper because, as of September 30, 1997, the only agreement between the parties was the June 4, 1997 agreement, which lacked essential terms and set forth contingencies. (*Id.* at 738–41, 743; Pl. Trial Ex. 78.) Even assuming, however, that all contingencies set forth in the June 4, 1997, and all essential terms of the parties' superceding agreement, were satisfied or agreed to

as of September 15, 1997, at most Solucorp could recognize revenue pro-rated over the last fifteen days of September 1997, and not for the entire quarter. (*Id.* at 740–41.) Thus, Solucorp's overstatement of revenue and earnings for the period would still be material. (*Id.*)

### 2. *December 31, 1997 Financial Statements*

On April 15, 1998, Solucorp filed a Form 10–K with the SEC for the six-month transition period ending December 31, 1997 that included audited financial statements for the six-month period. (SAF ¶ 45.) Included in the revenue reported for the six-month period were $1,090,919 accrued license fees payable by Smart. (*Id.*) Solucorp reported earnings of $19,515. Ms. Hoffman testified that the first criterion under GAAP for recognizing revenue was not met until the parties agreed to the essential terms of their licensing agreement, which did not take place until December 1997. (Trial Tr. at 747–51, 780–81; Pl. Trial Exs. 107, 108, 110, 119, 120, 122, 300 at 78–79.) Even assuming, however, that all contingencies set forth in the June 4, 1997, and all essential terms of the parties' superceding agreement, were satisfied or agreed to as of September 15, 1997, *at most* Solucorp could recognize revenue pro-rated over the last three months and fifteen days of the 1997 calendar year, and not for the entire six-month period. Thus, Solucorp's overstatement of revenue and earnings for the period would still be material. (Trial Tr. at 746–47.)

731.) The three committees she has served on are: (1) the Accounting Standards Executive Committee, which is the AICPA's spokesperson on technical accounting questions, such as revenue recognition under GAAP; (2) the Auditing Standards Board ("ASB"), which sets auditing standards throughout the United States; and (3) the Professional Ethics Executive Committee, which interprets ethical guidelines for CPAs and investigates alleged ethical violations. (*Id.*) Ms. Hoffman's experience in dealing with revenue recognition issues included work done in the field as an auditor. (*Id.*) Specifically, she worked on audits in which revenue recognition was a key factor, including serving as an audit partner of Main Hurdman and KPMG. (*Id.* at 732.) Additionally, she participated in the ASB's development of a guide for auditors on revenue recognition. (*Id.* at 731.)

In any event, revenue recognition of any amount beyond the $150,000 paid in cash in October 1997 was improper because the second criterion for revenue recognition—collectibility—was not satisfied. First, Smart was not complying with the terms of the parties' agreement. Specifically, Section 4.0 of the agreement dated as of September 15, 1997 set forth a payment schedule. (Pl. Trial Ex. 121 at SOL3800.) As of April 1998, when the Company filed its six-month financial statements with the SEC, Smart had failed to make *any* of the payments in the amounts and at the times specified. Of the $1.5 million owed by Smart under the terms of the agreement as of March 31, 1998, it had paid only $150,000 in cash, and the timing of that payment bore no relationship to the schedule in the agreement. (Trial Tr. at 751–53.) Second, Solucorp had no information demonstrating Smart's ability to pay.

A second reason is the uncertain value of the calcium sulfide to be produced in discharge of the $350,000 offset. Smart stored calcium sulfide produced for Solucorp at its facilities in China. Smart did not regard it as its responsibility to maintain the prepaid inventory in storage. The storage conditions and frequent rain posed a risk of product deterioration, to which Smart alerted Solucorp in 1997 or 1998, and told Solucorp to remove its inventory. (Zheng 7/20/01 Dep. at 66–69, 199.) Thus, Solucorp had no control procedures in place to ensure the existence or value of the calcium sulfide. (Trial Tr. at 758.)

Earnings were also materially overstated. (Pl. Trial Ex. 512 at 3.) Without this accrual, Solucorp would have recorded an approximate $920,000 loss. (Trial Tr. at 766–67.) This was also *qualitatively* material to Solucorp's financial statements in two respects. First, reporting positive earnings instead of an actual loss, particularly of the magnitude at issue here, is a critical factor in assessing a qualitatively material misstatement. (*Id.* at 766–67.) Second, a going concern footnote included in Solucorp's June 30, 1997 financial statements (Pl. Trial Ex. 114 at SOL1289 n. 1) was dropped from the Company's December 31, 1997 financial statements, apparently because of the increased revenue resulting from the license fee revenue recognition. (Trial Tr. at 767–68.)

### 3. *1998 Financial Statements*

Ms. Hoffman further testified that the license fees were not collectible throughout the 1998 calendar year, and therefore should not have been accrued. (*Id.* at 772.) The first year of the license under the agreement dated as of September 15, 1997 was from June 1, 1997 through May 31, 1998. (Pl. Trial Ex. 121.) As no revenue was recognized for the June 30, 1997 period, and the agreement dated September 15, 1997 was finalized after the close of the June 30, 1997 quarter, the Company determined to accrue the first-year license fee over the remaining eleven months. Each month's accrual was equal to eleven divided into $2 million. (Trial Tr. at 774.) Once the first year ended, however, and the Company commenced accruing at a rate of twelve divided into $2 million, this would have resulted in more than $2 million being recognized for the 1998 fiscal year. The Company accrued only $424,000 instead of $500,000 during the fourth quarter of the year, so as to arrive at $2 million. (*Id.* at 775–76; Pl. Trial Ex. 512 at 5.) On May 21, 1998, Solucorp filed with the SEC a Form 10–Q for the quarter ending March 31, 1998. Included in the revenue reported was $545,454 in accrued license fees (SAF ¶ 46; Pl. Trial Ex. 302 at 88; Trial Tr. at 778–79), which were not paid during the quarter. (Trial Tr. at 155–56.) By improperly accruing these license fees in spite of their not being collectible,

Solucorp overstated revenue by at least 49%.

On August 17, 1998, Solucorp filed with the SEC a Form 10–Q for the quarter ending June 30, 1998. The revenue reported for the quarter included $530,304 in accrued license fees, $500,000 of which was attributable to the Smart contract. (SAF ¶ 47; Pl. Trial Ex. 304 at 123; Trial Tr. at 779.) During the quarter, Smart had agreed to offset $618,750 in license fees against amounts Solucorp would owe for production of calcium sulfide. Disallowing it means that Solucorp overstated quarterly revenues by 47%. On November 16, 1998, Solucorp filed a Form 10–Q with the SEC for the quarter ending September 30, 1998. The revenue reported for the quarter included $500,000 in accrued Smart license fees (SAF ¶ 48; Pl. Trial Exs. 305 at 259, 512 at 5; Trial Tr. at 780), which were not paid during the quarter. Solucorp's revenues were overstated by 55%.

On April 16, 1999, Solucorp filed a Form 10–K with the SEC for the fiscal year ending December 31, 1998. The revenue reported for the twelve-month period included $2 million in accrued Smart license fees. (SAF ¶ 49; Pl. Trial Ex. 306 at 341, 361; Trial Tr. at 771, 780), of which only $618,000 had been paid through offsets in May of 1998. The situation with respect to collectibility of the license fee was the same as the year before. As of December 31, 1998, Solucorp was advancing funds to Smart in excess of amounts that it owed to Smart for inventory. Specifically, Solucorp had advanced $201,900 to Smart toward the purchase of calcium sulfide as of December 31, 1998. (Trial Tr. at 771; Pl. Trial Exs. 142 at MAC2453, 512 at 4.) In advancing these funds, Solucorp brought to a total of approximately $2.3 million the amount Smart *owed* Solucorp as of December 31, 1998. (Trial Tr. at 771–72; Pl. Trial Ex. 512 at 4.) This total consisted of accrued and unbilled license fees, and billed but unpaid license fees. (Trial Tr. at 770–71; Pl. Trial Ex. 512 at 4.) The $94,296 charge against Smart for defective calcium sulfide production from the previous period was still carried as an accounts receivable on Solucorp's books. (Trial Tr. at 771; Pl. Trial Ex. 512 at 4.) By improperly accruing the license fee, Solucorp overstated revenues by 47%. Solucorp would have reported an earnings loss of approximately $4 million had it not accrued the fees. (Trial Tr. at 777; Pl. Trial Ex. 512 at 5.)

Herman prepared the financial statements for the reporting periods December 31, 1997 through September 30, 1998; and, together with Mantia, signed and caused them to be filed with Solucorp's Forms 10–Q for the periods ending March 31, June 30 and September 30, 1998. Mantia also signed and caused to be filed the Form 10–K for the six-month transition period ended December 31, 1997 and for the fiscal year ending December 31, 1998. (SAF ¶ 50.) Solucorp reported its financial results for the fiscal year ending December 31, 1997, and for quarters ending March 31, June 30 and September 30, 1998, in press releases dated April 16, 1998 (Pl. Trial Ex. 136), May 21, 1998 (Pl. Trial Ex. 137), August 18, 1998 (Pl. Trial Ex. 138) and November 18, 1998, respectively. (SAF ¶ 51.)

Defendants charge that Ms. Hoffman's expert opinion was deficient because she ignored the fact that everybody involved with the June 4, 1997 agreement, including Li Zheng of Smart and Solucorp personnel, considered it to constitute a firm agreement to pay a $2 million license fee in the first year. (Defs. Proposed Findings of Fact at 37.) Defendants also argue that all contingencies to the agreement had been satisfied. For example, as to the requirement of a market survey, defen-

dants cite the testimony of Li Zheng that a market survey was "easily" completed within 60 days of the June 4, 1997 agreement. (Zheng 11/30/98 Tr. at 30.) This was consistent with Herman's understanding of the completion of the market survey. (Trial Tr. at 451.[11]) Li Zheng also stated in correspondence to Mantia, Van Duzen and Porteous, dated July 28, 1997, his conclusion that "[o]verall, China has the market for MBS technology," (Defs. Trial Ex. TT), indicating that a market survey had been completed by that time. Ms. Hoffman did not recall previously seeing that document. (Trial Tr. at 796.)

With respect to the "contingency" of establishing "viable operations," Ms. Hoffman expressed her own view that this meant that Smart would have to have remediation contracts to generate funds to pay the license fee to Solucorp—despite Li Zheng's testimony suggesting that the term meant "making the chemicals" and knowing "how to do the job using technology." (*Id.* at 799; Zheng 11/30/98 Tr. at 34.) Li Zheng sent correspondence to Van Duzen on September 22, 1997 stating, among other things, that "[o]ur delivery records in August and September have shown that we can stick to our proposed delivery schedules on time"—indicating that "viable operations" had been established. (Pl. Trial Ex. 126.) The final alleged "contingency" in the June 4, 1997 agreement was an agreement as to ongoing financial arrangements between the parties within a further four months. (Pl. Trial Ex. 78 at 1.) This was satisfied by the completion of the September 15, 1997 agreement.

With respect to the second criterion of revenue recognition, *i.e.*, collectibility, Smart had confirmed its obligations under the license agreement in two signed docu-

ments. (Defs. Trial Exs. WW, ZZ, BBB, DDD.) The auditor, Glenn Olhauser, testified that Smart's confirmation of its payment obligations was the primary evidence of collectability. (Trial Tr. at 158.) However, Ms. Hoffmann testified that she gave no weight to that factor in rendering her opinion. (*Id.* at 818.) The judgment of whether an obligation is collectable requires consideration of payments up until the time of the filing of the financial statements (but, by definition, not afterwards). (*Id.* at 817.) In this case, when the September 30 statements were filed with the SEC on December 22, there was a recent history of payment because on October 20 the Company had received $150,000 in cash from Smart. (*Id.* at 819.) With respect to Smart's ability to pay, Solucorp personnel were familiar with the Company's substantial contacts within the Chinese government and were involved with meetings with high ranking officials. (*Id.* at 1041–42.) Ms. Hoffman gave this no weight in rendering her opinion. (*Id.* at 823.) Van Duzen was very familiar with Smart, and knew of its extensive resources, (*id.* at 1134), further supporting the determination that the obligation was reasonably collectable.

### E. *Mantia's Representations to the Auditors*

In connection with MacKay's audit of the Company's December 31, 1997 financial statements, the Company provided a management representation letter dated February 27, 1998 to MacKay. Mantia and Spartz signed the letter and caused it to be provided to MacKay. (SAF ¶ 39; Pl. Trial Ex. 124; Trial Tr. at 170, 568.) It is standard audit procedure to obtain such a letter. (Trial Tr. at 170.) The letter stated, "[w]e acknowledge that we are respon-

---

**11.** Van Duzen, Solucorp's principal liaison with Smart, testified that he understood that the market survey had been completed at this point. (*Id.* at 1158–59.)

sible for the preparation of the consolidated financial statements in accordance with generally accepted accounting principles." (Pl. Trial Ex. 124; Trial Tr. at 477.) The respective responsibilities of the auditor and company management regarding the financial statements is further reflected in the audit report included in the Form 10–Ks filed for the periods ending December 31, 1997 and December 31, 1998, respectively. The report in each instance states, "These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit." (Pl. Trial Exs. 301 at 42, 306 at 338.)

## VIII. *Kemprowski, Mantia and Herman's Trades in Solucorp Securities*

### A. *Kemprowski's Trades*

#### 1. *Identified Trades*

Following the dissemination of the Company's November 22, 1995 press release, described above in Section IV.D.2; Kemprowski made a $82,409 profit by selling 95,500 Solucorp shares during the period November 22 through 30, 1995. Kemprowski was Solucorp's front person in building a relationship with IDMC. Notes generated by IDMC's Jose Capote reflect that Capote met with Solucorp personnel on November 13, 1995, apparently to discuss Solucorp exclusively licensing IDMC to use MBS at LANL. (Pl. Trial Ex. 50; Capote Dep. at 73–75, 81–82.) On November 16, 1995, Kemprowski began purchasing Solucorp shares, ultimately purchasing 19,500 shares by November 20, 1995. (Pl. Trial Ex. 504.) Kemprowski knew of the purported contract, having announced the $50 million deal to Solucorp's entire office. (Pl. Trial Ex. 400 at 98.) According to Kemprowski, his understanding that there was going to be $50 million worth of work

at the site was based on the press release that IDMC drafted and put out prior to the Solucorp press release, reflecting that volume of work at the site. (Trial Tr. at 945.) Following the November 22, 1995 announcement, the stock price increased from $7.67 to $9.42. (Pl. Trial Ex. 88.)

During the five-month period between the Company's December 3, 1997 announcement of its financial results (for the quarter ending September 30, 1997) and the SEC's May 1, 1998 trading suspension, Kemprowski avoided losses of at least $11,647 by selling 45,000 Solucorp shares. (Pl. Trial Ex. 502.) This calculation of avoided losses is based on a post-suspension price of $3.593 on May 15, 1998. (Pl. Trial Ex. 88.)

#### 2. *Unidentified Trades Through Vancouver Brokerage Accounts*

In April 1998, during a meeting at a McDonald's on the Garden State Parkway, Kemprowski told Kreisler that he would be selling Solucorp stock through his or his wife's brokerage accounts in Vancouver and that he was "making a market" in Solucorp stock. (Trial Tr. at 33–35.) Kemprowski also told Kreisler that he was making a market in Solucorp stock by buying and selling the stock in order to keep its price up around $10 per share, so that another company would be interested in acquiring Solucorp. (*Id.* at 47–48.)

Which accounts were referred to in Kemprowski's conversation with Kreisler is not known. Beyond those accounts identified by the defendant, there are other Vancouver accounts held in the name of London Venture Capital Corporation ("LVCC"), as to which Kemprowski admittedly exercised trading authority. (*Id.* at 867.) Kemprowski acknowledged selling Solucorp shares through these accounts. (*Id.* at 869.) Trading in these accounts is

not included in the disgorgement amount discussed hereinafter.

### B. *Mantia's Trades*

During the five-month period between the Company's December 3, 1997 announcement of its financial results (for the quarter ending September 30, 1997) and the SEC's May 1, 1998 trading suspension, Mantia avoided losses of $6,650 by selling 62,500 Solucorp shares. (Pl. Trial Ex. 312.) This calculation of avoided losses is likewise based on a post-suspension price of $3.593 on May 15, 1998. (Pl. Trial Ex. 88.)

### C. *Herman's Trades*

During the five-month period between the Company's December 3, 1997 announcement of its financial results (for the quarter ending September 30, 1997) and the SEC's May 1, 1998 trading suspension, Herman avoided losses of $6,370 by selling 3,000 Solucorp shares. (Pl. Trial Ex. 313.) This calculation of avoided losses is also based on a post-suspension price of $3.593 on May 15, 1998. (Pl. Trial Ex. 88.)

### IX. *Kemprowski and Mantia Failed to Timely File Insider Trading Reports*

On February 20, 1998, Solucorp's registration of its common stock with the SEC pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78*l* (g) ] became effective. Kemprowski failed to timely file a Form 3 reflecting his purported interest in Solucorp until August 13, 1999. (Pl. Trial Ex. 315.) He also failed to file Form 4s or Form 5s reflecting changes in his ownership of Solucorp securities. Although Mantia was an officer and director of Solucorp as of February 20, 1998, he failed to file a Form 3 reflecting his ownership of 17,500 shares of common stock and 210,000 options until April 30, 1999. Further, although he conducted over sixty transactions in Solucorp shares and options ranging from one month and three weeks to one year and three weeks, Mantia also failed to file a Form 5, which was due on February 15, 1999. Instead he filed delinquent Form 4s on April 30, 1999. The combined value of Mantia's changes in ownership reported in the late Form 4s for Solucorp exceeds $940,000. (Pl. Trial Ex. 312.)

### X. *Summary Finding*

■ Over a number of years, Solucorp and its executives engaged in a course of deception through the issuance of false and misleading press releases and financial statements in which, in a number of cases, they reported that the Company had entered into contracts that did not exist, in one case backdated a contract to increase the accrued revenue recognizable thereunder, and in many other cases reported that the minimum revenues to be derived from such contracts far exceeded the actual minimums. This pattern of deception was so consistent and pervasive that it cannot logically be attributed to mere negligence. The Court therefore finds that the executives responsible for the issuance of these press releases and financial statements, specifically Kemprowski, Mantia and Herman, knowingly and deliberately falsified them with the intention of deceiving shareholders and potential investors or, at the very least, were guilty of reckless disregard for the truth or falsity of the disclosures.

### CONCLUSIONS OF LAW

### A. *Violations of Federal Antifraud Statutes*

■ To prove its claims under Sections 10(b) and 17(a)(1), the SEC must show: (1) that a defendant, using the in-

strumentalities of interstate commerce, misrepresented or omitted certain facts; (2) that the misrepresentations or omissions were material; and (3) that the defendant acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *SEC v. Schiffer*, 97–CV–5835(RO), 1998 WL 226101 (May 5, 1998 S.D.N.Y.) (citing *Aaron v. SEC*, 446 U.S. 680, 695, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)). To establish scienter, a plaintiff must show that the defendant acted with the intent to deceive, manipulate or defraud investors. *In re Northern Telecom Ltd. Securities Litig.*, 116 F.Supp.2d 446, 462 (S.D.N.Y.2000). The requirement of scienter may be satisfied by proof of reckless conduct. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir.1978). Reckless conduct is behavior that is "highly unreasonable" and "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 47. Scienter depends in part on "the likely prospect of achieving concrete benefits by the means alleged." *In re Northern Telecom*, 116 F.Supp.2d at 464 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). To prove recklessness, a plaintiff must show that defendants had a " 'motive for deliberately shutting their eyes to the facts.' " *In re Northern Telecom*, 116 F.Supp.2d at 465 (citing *In re Fischbach Corp. Securities Litig.*, 1992 WL 8715, at *7 (S.D.N.Y. Jan.15, 1992)).

■ "The Commission can establish a violation of Sections 17(a)(2) or (a)(3) ... by showing merely that the [statement] was materially false and misleading and that defendants negligently caused those misrepresentations or omissions." *SEC v. Scott*, 565 F.Supp. 1513, 1525–26 (S.D.N.Y. 1983). The SEC has shown, by a preponderance of the evidence, that defendants Kemprowski, Mantia and Herman committed securities fraud by violating Section 17(a) of the Securities Act [15 U.S.C. 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. 78j(b) ] and Rule 10b–5 [17 C.F.R. 240.10b–5] thereunder.

### 1. *Interstate Commerce*

In carrying out their fraud, defendants Kemprowski; Mantia and Herman used the means and instrumentalities of interstate commerce, including, among other things, the mails and wires, including the Internet, news wires and telephone lines, to send and/or disseminate the false and misleading statements concerning Solucorp.

### 2. *"In Connection With"*

As defendants Kemprowski; Mantia and Herman disseminated false and misleading information into the marketplace through SEC filings, press releases and shareholder letters, they did so "in connection with" the purchase or sale of a security.

### 3. *False and Misleading Misstatements and Omissions*

With respect to the press releases, shareholders letters, annual reports, financial statements and SEC filings discussed above, defendants Kemprowski, Mantia and Herman made a series of false and misleading statements and omissions between 1995 and 1998.

### 4. *Materiality*

The misstatements and omissions at issue in this matter were material to the investing public, as they were the type of information shareholders and potential investors were likely to consider in making an investment decision.

### 5. *Scienter*

As discussed above, defendants Kemprowski; Mantia and Herman knew or, if they did not know, were at least reckless in not knowing that they were disseminating materially false and misleading statements and omissions in the press releases, shareholders letters, annual reports, financial statements and SEC filings discussed above.

## B. *Section 16(a) of the Exchange Act*

Effective February 20, 1998, Solucorp's securities were registered under Section 12(g) of the Exchange Act [15 U.S.C. § 78*l*(g) ].

Mantia was an officer and director of Solucorp as of February 20, 1998, and continues to serve in such capacity to date.

■ As of February 20, 1998, Kemprowski was also an officer of Solucorp for purposes of Section 16 of the Exchange Act. Kemprowski performed duties analogous to those of an officer and had access to insider information, in that he performed a policy-making function for an issuer akin to that of a president, principal financial officer or any vice-president in charge of a business unit, division or function.

As officers and/or directors of Solucorp, Mantia and Kemprowski were required to file a Form 3 with the SEC, disclosing their initial beneficial ownership of Solucorp securities, on February 20, 1998. [15 U.S.C. § 78p(a)(2)(A)-(B); 17 C.F.R. 240.16a–3(a).]

As officers and/or directors of Solucorp, Mantia and Kemprowski were required to file a Form 4 with the SEC to disclose any changes in their beneficial ownership of Solucorp securities, within 10 days of the end of the calendar month in which the ownership change occurred. [17 C.F.R. 240.16a–3(a).]

Finally, as officers and/or directors of Solucorp, Mantia and Kemprowski were required to file a Form 5 within 45 days of the end of Solucorp's fiscal year, disclosing any ownership of Solucorp securities not previously reported in Forms 3, 4 and 5. [17 C.F.R. 240.16a–3(f)(1).]

Kemprowski violated Section 16(a). Kemprowski failed to file a Form 3 with the SEC until August 1999. Additionally, Kemprowski failed to file at least three Form 4s with respect to trading in February, March and April 1998. Kemprowski also failed to file a Form 5 that was due on February 15, 1999.

Mantia also violated Section 16(a). Mantia failed to file a Form 3 reflecting his ownership of 17,500 shares of Solucorp common stock and 210,000 options until April 30, 1999. Mantia also failed to file until April 30, 1999, eleven Form 4s covering periods from March 1998 through February 1999. Mantia also failed to file a Form 5 that was due on February 15, 1999. The combined value of Mantia's changes in ownership reported in the late Form 4s for Solucorp exceeds $940,000.

Mantia is not exempt from the filing requirements of Section 16(a) based on his filing insider trading reports with the BCSC.

## C. *Section 13(b)(5) of the Exchange Act and Rule 13b2–2 Thereunder*

■ Mantia and Herman, through their role in the Company's financial fraud, knowingly falsified Solucorp's books, records, and/or accounts or were reckless in preparing or certifying them. In addition, both either circumvented or failed to implement a system of internal accounting controls for Solucorp.

Solucorp also improperly recognized revenue based upon a contract that Mantia and Herman knew, or were reckless in not

knowing, was not finalized and was backdated to support improper revenue recognition. Mantia also misrepresented the veracity of Solucorp's books and records to Solucorp's auditor during the course of its audit of Solucorp for fiscal year 1997. As a result, Mantia and Herman violated Section 13(b)(5) of the Exchange Act, Rule 13b2–1, and Mantia violated Rule 13b2–2, thereunder.

### D. Statutory & Equitable Remedies

#### 1. Permanent Injunctions

█ Kemprowski and Mantia should be permanently enjoined on the basis of their fraudulent activities in this case. Their misrepresentations to the investing public were numerous and inexcusable inasmuch as they at least grossly exaggerated and, in many instances, made materially false statements about contract terms.

#### 2. Officer and Director Bars

Kemprowski and Mantia are substantially unfit to be officers or directors of a public company. Accordingly, they are permanently barred from serving as an officer and/or director of a company registered with the SEC under Section 12 of the Securities Act.

#### 3. Disgorgement

█ While the scheme to fraudulently inflate Solucorp's revenue was ongoing and while they were in possession of material, non-public information concerning the overstatement of Solucorp's reported revenue, Kemprowski, Mantia and Herman sold Solucorp stock for their own accounts. Kemprowski, Mantia and Herman were thereby able to avoid losses by selling Solucorp securities prior to any public disclosure of Solucorp's true financial condition. The avoided losses of Kemprowski, Mantia and Herman are $11,647, $6,650 and $6,370, respectively, and they therefore should be ordered to disgorge these funds.

Kemprowski also sold shares following Solucorp's announcement in a November 22, 1995 press release that IDMC had issued to it a $50 million contract, notwithstanding that Kemprowski knew, or was reckless in not knowing, that the announcement was materially false and misleading. Solucorp's per share price surged following the November 22, 1995 announcement. Kemprowski profited from selling shares during that period in the amount of $82,409 and therefore should be ordered to disgorge this amount.

### E. Robert Kuhn

The evidence does not establish that Kuhn has committed any violations of the securities laws. All claims against him are therefore dismissed with prejudice.

SO ORDERED.